In re Billy Thomas **PULLEY** and
Angelia Kay Pulley, Debtors.

Gordon E. **GOUVEIA,**
Trustee, Plaintiff,

v.

Billy Thomas **PULLEY** and Bethlehem
Steel Corporation, Defendants.

Bankruptcy No. 88–61275.
Adv. No. 88–6176.

United States Bankruptcy Court,
N.D. Indiana,
Hammond Division at Gary.

Oct. 12, 1989.

S.W. Johnson, Portage, Ind., for defendant Billy Thomas Pulley, debtor/defendant (debtor).

M. McClintock Kennedy, Merrillville, Ind., for G. Gouveia, Chapter 7 Trustee, plaintiff/trustee (trustee).

G.P. Youra, Esq. and E.J. Szarwark of Barnes & Thornburg, South Bend, Ind., Bethlehem Steel Corp., for defendant Bethlehem (Bethlehem).

## MEMORANDUM OF DECISION ON SUMMARY JUDGMENT

FRANCIS G. CONRAD, Bankruptcy Judge *.

On November 10, 1988, the Trustee filed

* Sitting by special designation.

a "Complaint to Compel Turnover" [1] to the debtors' estate any interest Debtor had as a participant in an "Employee Investment Program" (EIP) with Bethlehem as of August 10, 1988, the filing date of the debtors' Chapter 7 Petition for relief under 11 USC §§ 101, *et seq.* The Trustee alleges, *inter alia,* that any interest Debtor has in the EIP is property of the estate under 11 USC § 541,[2] subject to a two-year waiting period because Debtor may withdraw common stock or cash sales proceeds from the EIP on a monthly basis. *Id.,* at page 1.[3]

Debtor's December 13, 1988 answer admits participation in the EIP with Bethlehem but alleges insufficient information and knowledge to form a belief that any interest of the Debtor in the EIP as of the date of the bankruptcy filing is property of the debtors' estate and, that Bethlehem is the custodian of the EIP funds. Debtor denies the Trustee's allegation that subject to a two year waiting period, Debtor "could withdraw common stock or cash proceeds from the sale thereof from the [EIP] on a monthly basis."

On February 6, 1989, the Trustee filed a "Motion for Preliminary Injunction" to enjoin Bethlehem from making any "cash profit-sharing payment" to Debtor under its EIP. After receiving evidence and argument from the Trustee at the preliminary injunction hearing,[4] we issued a preliminary injunction enjoining Bethlehem from making a cash profit-sharing payment to Debtor until further order of the Court.

On February 28, 1989, Bethlehem entered its appearance. On March 30, 1989, Bethlehem answered the Trustee's complaint and admits that: Debtor is a participant in Bethlehem's EIP; Bethlehem is a custodian of "any and all funds" in Debt-

1. We have jurisdiction over this matter under 28 USC § 1334(b) and the General Order of Reference to this Court, No. 45. This proceeding is a core matter under 28 USC § 157(b)(2)(E). This Memorandum of Decision constitutes findings of fact and conclusions of law under F.R.Civ.P. 52 as made applicable by Rules of Practice and Procedure in Bankruptcy Rule 7052.

2. 11 USC § 541(a), **Property of the estate,** states, *inter alia:*
(a) The commencement of a case sunder section 301, 302, or 303 of this title creates an estate. Such estate is comprised of all the following property, wherever located and by whomever held:
(1) Except as provided in subsections (b) and (c)(2) of this section, all legal or equitable interests of the debtor in property as of the commencement of the case....
(c)(1) Except as provided in paragraph (2) of this subsection, an interest of the debtor in property of the estate under subsection (a)(1), (a)(2), or (a)(5) of this section notwithstanding any provision in an agreement, transfer instrument, or applicable nonbankruptcy law—
(A) that restricts or conditions transfer of such interest by the debtor; or
(B) that is conditioned on the insolvency or financial condition of the debtor, on the commencement of the case under this title, or on the appointment of or the taking possession by a trustee in a case under this title or a custodian before such commencement, and that effects or gives an option to effect a forfeiture, modification, or termination of the debtor's interest in property.

(2) A restriction on the transfer of a beneficial interest of the debtor in a trust that is enforceable under applicable nonbankruptcy law is enforceable in a case under this title. 11 USC §§ 541(a)(1), (c)(1), (c)(2).

3. Exhibit A attached to the Trustee's complaint, entitled "Appendix 3 Employee Investment Program," states in part:
*3. Stock Ownership Plan*
*i. Rights of Conversion and Early Withdrawal.* The employee (including an employee terminated for cause) shall have the right at any time to have some or all of the shares of Preference Stock in his or her account converted into Bethlehem Common Stock at the rate of one share of Bethlehem Common Stock for each share of Preference Stock, and at such time or any thereafter, to direct the sale of some or all of the shares of his or her Bethlehem Common Stock. Some or all of the shares of the Common Stock, or all or any portion of the cash proceeds from the sale thereof, may be withdrawn by the employee on a monthly basis more than two years after the contribution of the Preference Stock which was converted into such shares of Bethlehem Common Stock. Cash may be paid in lieu of fractional shares on withdrawal. The Common Stock or Cash proceeds from the sale thereof may be withdrawn as of the end of any month.

4. The record reflects that Bethlehem was duly served but did not enter an appearance at the February 22, 1989 preliminary injunction hearing.

or's EIP;[5] and, subject to a two-year waiting period, Debtor may withdraw common stock or cash proceeds from the sale thereof from the EIP on a monthly basis. Bethlehem alleges as affirmative defenses that:

> {T}he debtor's interest in the Employee Stock Ownership portion of the [EIP] is not property of the estate. Payment of the debtor's interest in the ESOP [Employee Stock Ownership Program] to any person other than the debtor, even under an order of a bankruptcy court with jurisdiction over the debtor, may result in disqualification of the ESOP.

*Id.,* pages 1–2. Bethlehem's prayer asks that no payments be made directly to the Trustee, but only to Debtor. Bethlehem also asks that we require Debtor to authorize them to send the ESOP benefits directly to the State Street Bank trustee. *Id.,* at page 2.

On April 14, 1989, the Trustee filed a "Motion For Summary Judgment."

We paraphrase the Trustee's material facts:

(1) Debtor is an employee of Bethlehem;

(2) Debtor is a participant in Bethlehem's EIP and is entitled, under certain conditions, to receive cash profit-sharing payments as well as stock contributions held under an ESOP;

(3) Profit-sharing payments are based on profits earned by Bethlehem during the previous year and on the number of hours an employee has worked during that year;

(4) The projected payment date for the 1988 profit-sharing is March 1989;

(5) An employee may not withdraw amounts contributed to the ESOP until the earlier of termination of employment or two years from the date of contribution; and

(6) Debtor is entitled to his first withdrawal on October 16, 1989.

"Statement of Material Facts, Proposed Conclusions of Law, and Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment." Bethlehem does not dispute the Trustee's "material facts."

The premise of the Trustee's turnover action is that both the profit sharing and the stock contribution components of Bethlehem's EIP are, in part, earnings from services performed prior to Debtor's bankruptcy and, as such, constitute property of the estate. The Trustee concedes that the portion attributable to post-filing services is excluded from the estate.

As for Debtor's contribution to the EIP, the Trustee argues that the EIP was established to "allow Bethlehem Steel employees to make up wage concessions given up in the 1986 labor contract through profit-sharing and stock contributions by the company. The Debtor's right to receive amounts contributed to the ESOP according to the formula negotiated in the 1986 labor agreement is part of his estate." Trustee's "Statement of Material Facts, Proposed Conclusions of Law, and Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment," page 4.

The Trustee concludes that Debtor's contribution to the ESOP should be allocated pre- and post-petition, with the pre-petition contributions being property of the debtors' estate.

---

5. We note the documents in issue state that Bethlehem is the Plan Administrator and State Street Bank is the Employee Stock Ownership Plan's (ESOP) trustee. Section 11, *General information,* page 34: "The ESOP is employer-administrated. [Bethlehem] is the Plan administrator."

Section 7, *Trustee of the ESOP,* of Bethlehem's ESOP states in part that the trustee is subject to removal upon the unanimous agreement of both Bethlehem and the Debtor's Union:

> Bethlehem and State Street Bank and Trust Company ... have entered into a Trust Agreement, by which State Street acts as Trustee of the assets of the ESOP. The Trustee is selected subject to the approval of the Union and may be removed at any time by agreement between Bethlehem and the Union.

Section 7 Exhibit 2, page 19.

Despite the foregoing designations by the ESOP, we find Bethlehem is the *de facto* custodian over whom we may exercise jurisdiction to order distributions from the ESOP directly to the Debtor. The Trustee did not name State Street Bank and Trust Company as a defendant in this turnover action although the Bank is the ESOP's designated trustee. We question whether a turnover order from us directing the participant Debtor and custodian Bethlehem may compel compliance from the ESOP's trustee.

On April 28, 1989, Bethlehem responded with "Bethlehem Steel Corporation's Answer Brief in Opposition to the Plaintiff's Motion for Summary Judgment." It concedes that the EIP came from wage concessions and that the EIP consists of (a) an "Annual EIP Profit Sharing Pool" (EIP Pool), (b) an ESOP, and (c) a "Special Profit Sharing Plan" (Shortfall Plan).

 The EIP Pool is neither an Employee Retirement Income Security Act Plan (ERISA),[6] nor is it qualified[7] under the Internal Revenue Code (IRC) of 1986, 26 USC § 401(a). The Shortfall Plan is governed by ERISA as an employee benefit plan, but is not qualified under the IRC. The ESOP is both an employee benefit plan and is qualified under the IRC.

Bethlehem explains that a percentage of annual profits, if any, from the preceding year is made available by Bethlehem for the EIP Pool. Funds from the EIP Pool are used first to pay any shortfall payable under the Shortfall Plan. Excess cash from the EIP is paid to eligible employees. Any EIP investments not given to an eligible employee from the EIP Pool are reimbursed by a contribution of preference stock to the ESOP.

Preference Stock may be converted into common stock, with the employee able to direct its sale. Cash proceeds from the sale may be withdrawn by the employee upon termination of employment or two years from the date the preference stock was contributed to the ESOP. In-service withdrawals are also permitted due to financial hardship.[8]

The Shortfall Plan was established to make shortfall payments to ESOP beneficiaries whose conversion of preference stock does not produce the required amount under the EIP.

Bethlehem characterizes the Trustee's turnover argument as seeking a partial distribution from the EIP because that amount constitutes earnings from services performed by Debtor prior to bankruptcy. Bethlehem believes the Trustee is seeking an order which snares all allocable payments from the pre-bankruptcy period as property of the debtors' estate. Bethlehem argues against any order that would require Bethlehem to make distributions from the EIP Pool and the ESOP directly to the Trustee because:

> {c}ompliance with such an order in regard to the ESOP* would require [Bethlehem] to take action which the [IRS] has stated would risk disqualification of the ESOP under Section 401(a) of the Code [26 USC § 401], thereby harming the cor-

6. Pub.L. No. 93–406, 88 Stat. 898 (codified in 29 USC §§ 1001–1144, and in scattered sections of the IRC, generally at 26 USC §§ 401–418).

7. Disqualification of a plan does not mean the plan is invalid. Disqualification affects the deductibility of contribution, the taxation of plan earnings and participant earnings and contributions. 26 USC § 402(b). *See, Benbow v. Commissioner,* 774 F.2d 740 (7th Cir.1985).

8. Exhibit A attached to the Trustee's complaint, entitled "Appendix 3 Employee Investment Program," states in part:

*3. Stock Ownership Plan*
*f. Distribution Upon Retirement, etc.; Shortfall.* Upon retirement, death, disability, termination of employment (other than for cause) or hardship, the employee would be able either (i) to receive the Bethlehem Common Stock into which the Preference Stock is convertible plus a contingent right to receive the Shortfall payments described in this paragraph, or (ii) direct the Trustee to sell the Common shares and receive the proceeds, together with the contingent right, immediately or on a deferred basis, as permitted by ERISA. For this purpose, an employee shall be entitled to a hardship distribution only if he or she has been absent from work with the Corporation by reason of layoff or illness for more than 6 consecutive months and is no longer receiving supplemental unemployment benefits or sickness and accident benefits by reason of employment with the Corporation. In the event that the Common Stock on the date of distribution following retirement, death, disability or termination has a market value (equal to the average closing trading price on the NYSE for the 20 trading days immediately preceding the date of distribution) which is less than the stated value of the Preference Stock (such difference in value with respect to the distribution to any employee being herein referred to as "Shortfall"), the Shortfall shall be paid out of the Profit Sharing Pool, as provided in paragraph 2 above, or in the event the Profit Sharing Pool is not then in effect, from moneys which the Corporation would have paid into the Profit Sharing Pool if such Pool had continued in effect.

poration and thousands of innocent participants in the ESOP.

Bethlehem's answer brief, page 4 ([*] footnote in original, brackets supplied). The [*] footnote in Bethlehem's answer brief contains the following concession and reservation:

[*] Bethlehem Steel has no objection to an order directing payment of the 1988 EIP Profit Sharing Pool (EIP Pool) amount to the bankruptcy trustee. However, Bethlehem Steel does object to that portion of the requested order that would require a payment by the ESOP to the plaintiff of stock or cash credited to Mr. Pulley's (Debtor's) account in the ESOP.

*Id.*, at page 4 (parentheticals supplied).

Bethlehem advances three points to support its counter: 1) the relief sought violates Federal Law and congressional policy to the prejudice of innocent beneficiaries, 2) Debtor's interest in the ESOP cannot become part of the bankruptcy estate, and 3) "the court has options which would protect creditors and the legitimate interests of the ESOP and its beneficiaries."

On their first point, Bethlehem relies on 26 USC § 401(a)(13)(A) [9] which provides that a retirement plan qualified under the IRC may not permit either a voluntary or involuntary alienation of the interests of plan participants. Further, they argue, Congress intended to exempt qualified funds from the reach of court process because the sole exception to the anti-alienation requirement is a qualified domestic relations order (QDRO) under 26 USC § 401(a)(13)(B).[10] Section 15 of Bethlehem's ESOP[11] complies with ERISA re-

---

**9.** 26 USC § 401(a)(13)(A), *Qualified pension, profit-sharing, and stock bonus plans,* provides:
**(a) Requirements for qualification.**

A trust created or organized in the United States and forming part of a stock bonus, pension, or profit-sharing plan of an employer for the exclusive benefit of his employees or their beneficiaries shall constitute a qualified trust under this section— ...

**(13) Assignment and alienation**

(A) In general. A trust shall not constitute a qualified trust under this section unless the plan of which such trust is a part provides that benefits provided under the plan may not be assigned or alienated. For purposes of the preceding sentence, there shall not taken into account any voluntary and revocable assignment of not (sic) to exceed 10 percent of any benefit payment made by any participant who is receiving benefits under the plan unless the assignment or alienation is made for purposes of defraying plan administration costs. For purposes of this paragraph a loan made to a participant or beneficiary shall not be treated as an assignment or alienation if such loan is secured by the participant's accrued nonforfeitable benefit and is exempt from the tax imposed by section 4975 (relating to tax on prohibited transactions) by reason of section 4975(d)(1). This paragraph shall take effect on January 1, 1976 and shall not apply to assignments which were irrevocable on September 2, 1974.

**10.** 26 USC § 401(a)(13)(B), *Qualified pension, profit-sharing, and stock bonus plans,* provides:
**(a) Requirements for qualification.**

. . . . .

**(13) Assignment and alienation**

. . . . .

(B) Special rules for domestic relations orders. Subparagraph (A) shall apply to the creation assignment, or recognition of a right to any benefit payable with respect to a participant pursuant to a domestic relations order, except that subparagraph (A) shall not apply if the order is determined to be a qualified domestic relations order.
We point out that in addition to QDRO's, 26 USC § 401(a)(13)(A) allows a 10 percent benefit assignment and loans to a participant. *See,* footnote 9, *supra.* Bethlehem's plan provides for two of these exceptions. *See,* footnote 11, *infra.*

**11.** Section 15 of Bethlehem's ESOP contains the following provision:
*No Assignment of Benefits.*

Except to the extent provided in Section 12, a Participant shall not receive any payment, withdrawal or distribution under the Plan during his Service; nor may his interest in the Plan as a Participant be assigned or alienated by voluntary or involuntary assignment, except (1) pursuant to a 'qualified domestic relations order' as determined pursuant to Section 414(p) of the Code [IRC], or (2) pursuant to any voluntary and revocable assignment of not to exceed ten (10) percent of any benefit distribution made by or on behalf of any Participant who is receiving benefits under the Plan (provided that the assignment is not made for purposes of defraying administration costs of the Plan). Except as provided herein, any attempt by a Participant to assign or alienate his interest under the Plan, or any attempt to subject his interest to attachment, execution, garnishment or other legal or equitable process, shall be void.

Section 12 of the ESOP permits in-service distributions on a monthly basis after two years from the date the Preference Stock was contributed to an employee's account and in the event of financial hardship.

quirements. Moreover, the IRS's Private Letter Rulings [12] take the position that compliance with a Bankruptcy Court order to turnover such funds to the bankruptcy trustee will risk disqualification of the plan. Therefore, if Bethlehem was ordered to turnover the funds sought by the Trustee as part of the debtors' estate Bethlehem's ESOP will be disqualified from favorable treatment under the IRC with the possible loss of tax deductions, and taxation of plan earnings, participant earnings and contributions.

Second, and shifting away from the ERISA argument, Bethlehem says the anti-alienation provision in Debtor's ESOP excludes it from becoming part of the debtors' estate under the spendthrift trust exception of 11 USC § 541(c)(2). The anti-alienation provision in Bethlehem's ESOP is enforceable under applicable State law of Indiana.[13]

Third, in the event this Court follows those Courts that hold § 541(c)(2) applies only to traditional State spendthrift trusts and not to ERISA pension and profit shar-

ing plans, then, to prevent disqualification to the prejudice of the ESOP and innocent participants, this Court should only order Debtor to turnover to the Trustee any payments which are properly distributable to Debtor under the terms of the ESOP.

On May 1, 1989, Debtor filed a cross-motion for summary judgment, together with a statement of material facts. Debtor's "Statement of Material Facts" acquiesces to the Trustee's facts but adds that of the three components to Bethlehem's EIP, i.e., the EIP Pool [14]; ESOP; [15] and Shortfall, only the EIP Pool and the ESOP are in issue.

As for the EIP Pool, Debtor expects to receive a distribution on or about April 15, 1989 based on Debtor's EIP Investment Amount for the work performed in 1988. Debtor's interest in the ESOP Account, however, is triggered by the earlier of termination of employment or two years after the Preference Stock was contributed by Bethlehem to the ESOP Account.

Since the initial stock contribution for the year of 1986 was made on October 15,

---

Bethlehem's answer brief Pages 5–6 (brackets supplied).

**12.** *See,* IRS Private Letter Rulings 8829009 (April 6, 1988), 8131020 (May 5, 1981), and 8910035 (March 10, 1989), *infra.*

**13.** Indiana Code § 30–4–3–2, *Power to retrain transfer of a beneficiary's interest,* now provides:
Sec. 2. (a) The settlor may provide in the terms of the trust that the interest of a beneficiary may not be either voluntarily or involuntarily transferred before payment or delivery of the interest to the beneficiary by the trustee.
(b) Except as otherwise provided in subsection (c), if the settlor is also a beneficiary of the trust, a provision restraining the voluntary or involuntary transfer of his beneficial interest will not prevent his creditors from satisfying claims from his interest in the trust estate.
(c) Subsection (a) applies to a trust that meets both of the following requirements regardless of whether or not the settlor is also a beneficiary of the trust:
(1) The trust is a qualified trust under 26 U.S.C. 401(a).
(2) The limitations on each beneficiary's control over the beneficiary's interest in the trust complies with 29 U.S.C. 1056(d).
(d) A trust containing terms authorized under subsection (a) may be referred to wherever appropriate as a trust with protective provisions.

**14.** *Annual EIP Profit–Sharing Pool*—A specified percentage of annual profits, if any, is made

available by Bethlehem for the EIP Profit–Sharing Pool. Said Pool is first used to pay any "shortfall" payable under the Special Profit–Sharing Plan as described below. The remaining Pool is then paid in cash to eligible employees in proportion to their EIP Investment Amount for that year.
*Id.,* at page 2.

**15.** *Employee Stock Ownership Plan ESOP*—The ESOP provides participants with an opportunity to share in Bethlehem's growth as well as an opportunity to accumulate capital for the participant's future economic security. As such, an EIP investment amount not reimbursed to a participant for the EIP Profit Sharing Pool is reimbursed by contribution by Bethlehem Steel of its Preference Stock to the ESOP. The Preference Stock contribution is held by an outside Trustee, State Street Bank and Trust Company, under a trust established by Bethlehem and the Trustee, which is not under Bethlehem's control and ownership. Participants in the ESOP are entitled to protection under the Employee Retirement Income Security Act (ERISA) pursuant to a favorable IRS determination dated June 2, 1988, finding that the ESOP qualified as a Stock Bonus Plan and an Employee Stock Ownership Plan under the requirement of the Internal Revenue Code Sections 401(a) and 4975(e)(7).
*Id.,* at 2.

1987, no in-service (non-hardship) distribution can be made prior to October 16, 1989. At that time, the Debtor may make his first withdrawal; however, such withdrawal only concerns the initial contributions made by Bethlehem on October 15, 1987. Subsequent withdrawals must wait the required two year period. Debtor's Memorandum page 3.

Debtor proposes that the EIP pool and ESOP are not property of the estate because:

> they consisted only of entitlement to future payments and not a right to present access to funds. Even assuming arguendo that Debtor's interest in the [EIP Pool] component of the EIP is property of the estate, Debtors (sic) interest in the ESOP should be exempt as a qualified Pension Benefit Plan under ERISA provisions.

*Id.*, at page 4 (brackets supplied).

Debtor argues that post-petition earnings are exempt from becoming property of the bankruptcy estate. Five days after the filing of the debtors' bankruptcy petition, Bethlehem made a contribution to the EIP Pool based on Debtor's "Annual Investment."[16] Because the EIP and its pool reimburses an employee for reduction in wages, Debtor's interest in the EIP Pool, which was due and owing as of the filing of the bankruptcy petition but not payable until after the April 15, 1989 contribution date, should be considered post-petition wages and declared exempt property.

Further, and in addition to a possible disqualification of the favorable tax treatment presently accorded to the ESOP, Debtor argues that its interest in the ESOP "consist{s} only of an entitlement to future payments and not a right to present access to funds as of the commencement of the bankruptcy case, Debtor's interest in said ESOP Account should not be property of the estate." *Id.*, at page 6.

According to the Debtor, October 16, 1989 is the earliest date accorded to withdraw monies from the ESOP, *i.e.*, because Debtor is still employed and absent a hardship, the two year waiting period, after the Preference Stock contribution by Bethlehem to the ESOP on October 15, 1987, controls. Debtor argues that filing for bankruptcy protection does not qualify for the hardship exception because he continues to be employed by Bethlehem.

With the contentions of the parties focused, the Trustee, in his reply papers, narrows the dispute to: a) whether Debtor's Shortfall Pool and ESOP funds[17] are property of the estate; and, b) whether the subject funds are excepted from becoming property of the estate under 11 USC § 541(a)(6)[18] (earnings from services performed after the commencement of the bankruptcy case) or § 541(c)(2) (spendthrift exception).

In the event we determine the funds are property of the estate and reach the exemption issue, the Trustee reminds us that the 11 USC § 522(d)(10)(E)[19] Federal ex-

**16.** Debtor defines "Annual Investment" as:
(The term 'Annual Investment' as used herein with respect to any year means the amount by which an employee's wages and benefits during such year under the 1986–1989 Labor Agreements fall below what would have been his wages and benefits that year had the wages and benefits scheduled under (sic-the) 1983 Agreement (including cost of living adjustments) (sic-that had) been in effect through out the 1986–1989 Labor Agreements.) *Id.*, at page 5.

**17.** The parties have conceded in their pleadings that the EIP Pool is property of the estate.

**18.** 11 USC § 541(a)(6), *Property of the estate*, provides:
(a) The commencement of a case under section 301, 302, or 303 of this title creates an estate. Such estate is comprised of all the fol-

lowing property, wherever located and by whomever held: ...
(6) Proceeds, product, offspring, rents, or profits of or from property of the estate, *except such as are earnings from services performed by an individual debtor after the commencement of the case.*
*Id.* (emphasis supplied).

**19.** 11 USC § 522(d)(10)(E) states a debtor has the right to exempt and receive:
(E) a payment under a stock bonus, pension, profitsharing, annuity, or similar plan or contract on account of illness, disability, death, age, or length of service, to the extent reasonably necessary for the support of the debtor and any dependent of the debtor, unless—
(i) such plan or contract was established by or under the auspices of an insider that em-

emption does not apply because Indiana has "opted out" of the Federal exemption scheme under 11 USC § 522(b)(1). *See, In re Ondras*, 846 F.2d 33, 35–36 (7th Cir. 1988) (Indiana properly opted out of the federal exemption scheme); *In re Marino*, 27 B.R. 282 (Bkrtcy.N.D.Ind.1983) (§ 522(d) is not applicable to Indiana debtors). The applicable Indiana exemption is $100.00.[20]

The Trustee readily acknowledges that § 541(a)(6) excepts post-petition earnings from becoming property of the estate; however, he draws a distinction between post-petition revenue generated by post-petition work and post-petition revenue generated from pre-petition work. The Trustee argues that the latter is not excepted and seeks that part of the profit-sharing funds and ESOP interest that were earned by the Debtor pre-petition and contributed by Bethlehem pre-petition.

The Trustee notes that Indiana law considers the ability to gain access to pension or savings funds as dispositive on the issue of whether the funds become part of the estate. The Trustee distinguishes a line of cases where Courts refused to declare traditional pension plans, *i.e.*, funds that were available to the debtor only on termination or retirement, as part of the bankruptcy estate from the instant case.

> Although it is true that the debtor here does not have access exactly upon the date of bankruptcy, he likewise does not have to wait until retirement for the benefits in question or, in an obviously unacceptable alternative, terminate his employment to receive them.... [T]he

ployed the debtor at the time the debtor's rights under such plan or contract arose;
(ii) such payment is on account of age or length of service; and
(iii) such plan or contract does not qualify under section 401(a), 403(a), 403(b), 408, or 409 of the Internal Revenue Code of 1954 (26 USC §§ 401(a), 403(a), 403(b), 408, or 409).

**20.** Indiana Code Ann. § 34–2–28–0.5, *Exemptions allowed and prohibited*, provides:

In accordance with section 522(b) and the Bankruptcy Code of 1978 (11 USC § 522(b)), in any bankruptcy proceeding, an individual debtor domiciled in Indiana:
(1) Is not entitled to the Federal exemption as provided by section 522(d) of the Bankruptcy Code of 1978 (11 USC § 522(d)); and

monetary restrictions on access present here are not the type that would except the funds under the Section 541(c)(2) spendthrift trust reasoning.... The debtor's retirement security was not the basis for the short delay in access present here.

Trustee's *Memorandum Response In Opposition to Debtor's Motion for Summary Judgment*, page 5.

It is Debtor's ability to gain access to funds, the Trustee argues, that disqualifies the funds from being excepted under the spendthrift provision of § 541(c)(2). Moreover, the slight procedural delay to the funds imposed by Bethlehem, is not the type of delay that qualifies under § 541(c)(2)'s spendthrift exception. Rather, "access must be delayed until retirement to protect an employee from any intervening improvidence." *Id.*, at page 6.

The Trustee directs our attention to Bethlehem's Summary Plan Description, effective July 1, 1986, for a portrayal of this access:

> *d. In–Service Distribution*
> Prior to your termination of service, you may, in any month, elect to receive a distribution in shares of Common Stock or cash equal to any part or all of your ESOP Account. Such a distribution, however, cannot include Common Stock or cash attributable to the conversion of Preference Stock until two years after the Preference Stock was contributed by Bethlehem to the ESOP, unless you qualify for an immediate hardship distribu-

(2) May exempt from the property of the estate only that property specified by Indiana law.

*Id.* (Burns Supp.1986).

Ind.Code Ann. § 34–2–28–1, *Amount of exemption*, provides in pertinent part:
(a) The following property of a judgment debtor domiciled in Indiana is not subject to levy or sale on execution or any other final process from a court, for a judgment founded upon an express or implied contract or a tort claim: ...
(3) Intangible personal property, including choses in action (but excluding debts owing and income owing), of one hundred dollars ($100).

*Id.* (Burns Supp.1986).

tion.... For example, suppose that you wanted to receive a distribution, in shares of Common Stock or cash, from your allocation of Preference Stock that was contributed on March 2, 1988. You cannot receive that distribution until on or after March 3 1990. This restriction also applies to any of the dividends or interest earned on those assets held for your Account that are attributable to the Preference Stock that was contributed on March 2, 1988. You should refer to your Annual Statement to see which assets are presently available to you for an in-service, non-hardship, distribution. This does not prevent you from being able at any time to convert the Preference Stock into Common Stock for retention in your ESOP Account. See the earlier discussion, 'Your Optional Conversion of Preference Stock and Sale of Common Stock' beginning on Page 16 of this booklet.[21]

Since an in-service distribution may be an early withdrawal from a qualified plan, your distribution may be subject to an additional 10% Federal Tax penalty unless the distribution comes within one of the exceptions described in Paragraph 9.g beginning on Page 31 of this booklet.[22]

If you elect such an in-service, non-hardship, distribution, you will lose your contingent right to a Shortfall payment under the Special Profit Sharing Plan.

*Id.*, at pages 22–23 (footnotes supplied).

The Trustee's reply to Bethlehem's answer brief further notes that Bethlehem does not object to an order directing payment of Debtor's 1988 profit-sharing money to the Trustee.

Recognizing some of Bethlehem's concerns, the Trustee proposes that Bethlehem turn over Debtor's allocable interest in the profit-sharing and ESOP plans, as of the date of the debtors' bankruptcy filing, to Debtor in care of the Trustee. Ever the prudent bargainer, the Trustee also suggests that Debtor execute an irrevocable power of attorney to the Trustee.[23]

The Trustee notes that we should be concerned with the purpose behind the anti-alienation provisions and points out that

**21.** Page 16 of Bethlehem's Summary Plan Description provides:

*a. Your Optional Conversion of Preference Stock and Sale of Common Stock*
In any month you can direct the Trustee to convert shares of Preference Stock in your ESOP Account to Common Stock for retention in your ESOP Account. Preference Stock will be converted to Common Stock on a share-for-share basis after adjusting for any unpaid dividends. You may also choose to have the Trustee sell that Common Stock for cash and have the net proceeds of the sale retained in your Account. For this purpose, the net proceeds of your sale will be equal to the number of shares sold for your Account multiplied by the average selling price, less broker's fees, of all shares of Common Stock sold by the Trustee for all ESOP Participants for that month.
If the conversion of your Preference Stock is not part of a distribution due to your termination of service or a hardship (as defined in the Labor Agreements), you will lose your contingent right to a Shortfall payment under the Special Profit Sharing Plan. If your termination is 'for cause' you will also lose your contingent right to a Shortfall payment....

**22.** Pages 30–32 of Bethlehem's Summary Plan Description provides:
*9. TAX INFORMATION*

*d. Tax Treatment of In–Service Distributions*
Under the provisions of the ESOP, it is possible for you to elect to receive distributions from your ESOP Account before your termination of service....
*g. Penalty Tax on Early Distributions*
Distributions from the ESOP, including distributions at termination of service, will be subject to a penalty tax of 10% unless one of the exceptions to the tax, as described below, applies. The penalty tax is in addition to the normal tax imposed on the taxable amount of a distribution.... The exceptions to the penalty tax which are applicable to distributions from your ESOP Account are described below. That is, the 10% penalty tax will not be imposed on—
(i) any distributions to you from your ESOP Account which made before January 1, 1990;
(ii) cash dividends paid to the ESOP Trust for you on shares of Preference Stock or Common Stock which you elect to have distributed to at that time by the Trustee;

. . . . .

(vii) a distribution made to an alternate payee under a Qualified Domestic Relations Order;
...
*Id.*

**23.** With these concessions by both the Trustee and Bethlehem, the dispute now is between the Trustee and Debtor.

the restrictions on alienation usually found in plans of this type are for tax purposes.

Access upon the date of bankruptcy is not a magic talisman, but a method for seeing that the purpose behind a plan is served. If the plan functions to protect a debtor's future income after retirement, there is no access and the funds are not part of the estate. If the plan functions as the equivalent of a savings plan and the debtor has access on the date of bankruptcy or shortly thereafter, then the funds should be part of the estate.

*Id.*, at page 8.[24]

Finally, the Trustee advances a pre-petition service argument from the ESOP's admitted purpose:

The purpose of the ESOP is to recognize the wage reduction under the above mentioned labor agreements of represented employees such as yourself by providing you with an opportunity to share in the growth and prosperity of Bethlehem Steel Corporation and to accumulate capital for your future economic security. This capital is in the form of shares of Employee Stock Ownership Plan Convertible Preference Stock which Bethlehem contributes for you to the ESOP based on the amount of your wage reductions that have not been reimbursed through profit sharing....

The purpose of the ESOP is to reimburse eligible employees for the reduction in wages under the labor agreements. The ESOP provides you and other Participants with an opportunity to share in Bethlehem's growth and prosperity and to enable you to accumulate capital for your economic security. As a Participant you have certain dividend and voting rights on the shares of Preference and Common Stock allocated to your account.

*Id.*, at pages 1 and 8 (quoting Bethlehem's Summary Plan Description, effective July 1, 1986).

Thus, the Trustee argues:

[T]he ESOP functions partially as a savings plan or as a form of catch-up for employees who have given up wages in earlier labor negotiations. Neither of these purposes of the settlor have anything to do with protecting an improvident debtor from his spendthrift ways. Rather, the two-year delay between contributions of shares by Bethlehem and the permissible withdrawal of these shares by the employee is for the convenience of Bethlehem.[25] Therefore, the fact that access to ESOP shares is delayed slightly beyond the date of bankruptcy is not a reason to declare the funds not part of the estate. Only when access is delayed until retirement age should a pension fund be excluded under

---

**24.** *See, First National Bank of Blue Island v. Board of Governors,* 802 F.2d 291, 293 (7th Cir. 1986), the Seventh Circuit described ESOP's as having multiple purposes. We are concerned with their retirement purposes:

[ESOPs] are a form of statutory pension programs designed to invest employee retirement assets in the stock of the employer.... The goal of the ESOP program is to broaden ownership of capital. The ESOP program provides a form of deferred compensation and retirement benefits created to encourage increased employee ownership. Leveraged ESOPs are authorized to borrow money in order to finance the stock purchase.... Because of enormous tax advantages, corporations are encouraged to establish ESOPs and then use the program to borrow money for capital improvements and other corporate investments. Through leveraged potential, Congress has transformed the ESOP from a simple retirement account into a corporate financing tool ... In fact the legislative history of the ESOP program discloses Congressional intent to promote ESOPs as a suitable device for a broad range of corporate activity.

*Id.,* 802 F.2d at 293.

**25.** The Trustee explains the practical reason for the two-year delay:

"Although Bethlehem has not objected to payment of the debtor's profit-sharing money to the trustee, it should be noted here that Bethlehem's purpose in delayed payment of profit-sharing is purely practical. The amount of profit-sharing money made available is based on net income, which must be figured after the closing of the fiscal year. (See No. 2(a) of Ex. A. of the Complaint to Compel Turnover.) (sic) Distributions comes several months after that close, allowing time for the actual logistics required. The objective is not to prevent employees from unwise expenditures."

*Id.,* page 10.

Section 541(c)(2). The access that the debtor has here to his ESOP funds is sufficient access for the Court to find that the ESOP is not a spendthrift trust. To so find and to include the funds in the debtor's estate will not impair either objective of the ESOP (employee savings and recapture of wage concessions).

Trustee's memorandum pages 9–10.

### DISCUSSION

The granting of a motion for summary judgment is proper if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. F.R.Civ.P. Rule 56(c).[26]

■ The movant "has the burden of establishing the lack of a genuine issue of material fact." *Big O Tire Dealers, Inc. v. Big O Warehouse*, 741 F.2d 160, 163 (7th Cir.1984); *Korf v. Ball State University*, 726 F.2d 1222, 1226 (7th Cir.1984); *Egger v. Phillips*, 669 F.2d 497 (7th Cir.1982). A moving party meets this burden by affirmatively demonstrating from the record before the Court that there is no evidence to support an essential element of the nonmoving party's case. *Matter of Warner*, 65 B.R. 512 (Bkrtcy.S.D.Ohio 1986). To prevent the entry of summary judgment there must be a legitimate, bona fide dispute about a fact that affects the relative rights and obligations of the parties. A dispute on a collateral fact will not forestall judgment. *See, i.e., In re Ohring*, 57 B.R. 714 (Bkrtcy.N.D.Ind.1986).

■ The threshold question is whether there is an issue of fact to be tried. Any doubt as to the existence of a material fact must be resolved against the movant. *Hawkins v. Frick–Reid Supply Corp.*, 154 F.2d 88 (5th Cir.1946).

■ F.R.Civ.P. Rule 56 imposes a dual burden on the movant, i.e., to establish the absence of a genuine issue of material fact and to establish summary judgment is warranted as a matter of law. *Boazman v. Economics Laboratory, Inc.*, 537 F.2d 210 (5th Cir.1976).

■ Once a movant has met the initial burden, the opposing party must "set forth specific facts showing that there is a genuine issue for trial." *Posey v. Skyline Corp.*, 702 F.2d 102, 105 (7th Cir.1983), *cert. denied*, 464 U.S. 960, 104 S.Ct. 392, 78 L.Ed.2d 336 (1983). Thus, the nonmovant may not rest on the allegations contained in its pleadings, but rather, must produce significant probative evidence to support its opposition and position. *First National Bank v. Cities Service Co.*, 391 U.S. 253, 289–90, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569 (1986); *United States v. Pent-R-Books, Inc.*, 538 F.2d 519 (2d Cir.1976), *cert. denied*, 430 U.S. 906, 97 S.Ct. 1175, 51 L.Ed.2d 582.

■ When ruling on a motion for summary judgment, we must accord inferences from facts contained in the pleadings, attached exhibits, and depositions most favorably to the party opposing the motion. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Fitzsimmons v. Best*, 528 F.2d 692 (7th Cir.1976); *Yorger v. Pittsburgh Corning Corp.*, 733 F.2d 1215 (7th Cir.1984). Such inferences, however, must be reasonable. 9 Wright, Miller and Kane, *Federal Practice and Procedure*, § 2528 at n. 15 and n. 18. Our speculation and conjecture will not suffice. *Id.*, at § 2528 n. 19. *See, Barwick v. Celotex Corp.*, 736 F.2d 946 (4th Cir.1984).

In *Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 822 F.2d 656, 659 (7th Cir. 1987), the Seventh Circuit stated:

A genuine issue for trial only exists when there is sufficient evidence favoring the nonmovant for a jury to return a verdict for that party. As the Supreme Court has stated, "[i]f the evidence is merely colorable, or is not significantly

---

**26.** F.R.Civ.P. Rule 56, *Summary Judgment,* is made applicable by Rules of Practice and Procedure in Bankruptcy Rule 7056. F.R.Civ.P. Rule 56(c) provides in part:

[T]he judgment sought shall be rendered if the pleadings, depositions, answers to interroga-tories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

**728**

probative, summary judgment may be granted." We must not weight the evidence. Instead, we must see if the nonmovant's evidence is sufficient. In determining whether evidence is sufficient, we must of necessity consider the substantive evidentiary standard of proof, for example, preponderance of the evidence, that would apply at a trial on the merits. In addition, we draw all inferences in favor of the nonmovant. Such inferences, however, must be "justifiable."

*Id.*, (citations and footnote omitted).

■ We must penetrate the allegations of fact contained in the pleadings and look to any evidential source to determine whether there is an issue of fact to be tried. *Parmelee Transportation Co. v. Keeshin*, 292 F.2d 794 (7th Cir.1961).

■ The Seventh Circuit in *Egger v. Phillips*, 710 F.2d 292, 296 (7th Cir.1983), (en banc) *cert. denied*, 464 U.S. 918, 104 S.Ct. 284, 78 L.Ed.2d 262 (1983), held that to preclude a summary judgment, the nonmoving party must show the disputed fact to be material. That is, it must be outcome-determinative under applicable law. Thus, facts not outcome-determinative under applicable law, though in dispute, will not prevent the entry of a summary judgment. In *Mintz v. Mathers Fund, Inc.*, 463 F.2d 495, 498, (7th Cir.1972), the Court stated that, "appellate courts should not look the other way to ignore the existence of the genuine issues of material facts, but neither should they strain to find the existence of genuine issues where none exists." See, *Kirk v. Home Indemnity Company*, 431 F.2d 554 (7th Cir.1970).

■ Nor may summary judgment serve as a substitute for a trial when there are disputed material facts. *See, i.e., Becker v. Marketing and Research Consultants, Inc.*, 526 F.Supp. 166 (D.Colo.1981). It is inappropriate to grant summary judgment merely because a movant appears more likely to prevail at trial; summary judgment may be granted only when the movant is entitled to relief beyond all doubt. *Federal Sav. and Loan Ins. Corp. v. Williams*, 599 F.Supp. 1184 (D.Md.1984).

■ When we grant a summary judgment motion, we have concluded that the evidence proffered by the nonmovant would not convince a reasonable jury to return a verdict in its favor. *Munson v. Friske*, 754 F.2d 683, 690 (7th Cir.1985); *Weit v. Continental Illinois National Bank & Trust Co.*, 641 F.2d 457, 461 (7th Cir.1981), *cert. denied*, 455 U.S. 988, 102 S.Ct. 1610, 71 L.Ed.2d 847 (1982).

■ In connection with a motion for summary judgment, the affiant must ordinarily set forth facts, rather than opinions or conclusions. An affidavit which is essentially conclusory and lacking in specific facts is inadequate to satisfy the movant's burden. *Maldonado v. Ramirez*, 757 F.2d 48 (3d Cir.1985).

■ The existence of a factual dispute does not necessarily preclude summary judgment; rather, the Court must initially determine the existence of an issue of fact which is both "genuine" and "material." *In re GHR Energy Corp.*, 62 B.R. 226 (Bkrtcy.S.D.Tex.1986).

■ Summary judgment is inappropriate where the resisting party comes forth with affidavits or other material that generate a genuine uncertainty as to the true statement of any material fact. *Burlington Coat Factory Warehouse v. Bell Bros. Co.*, 621 F.Supp. 224 (S.D.N.Y.1985).

■ Once a fact is determined to be material, we must determine whether there is a genuine issue regarding it. The existence of a genuine issue for trial, precluding summary judgment, is predicated on the existence of a legal theory which remains viable under the asserted version of the facts and which would entitle the party opposing the motion, assuming his version to be true, to a judgment as a matter of law. A factual dispute is "genuine" when it is manifested by substantial evidence going beyond the allegations of the complaint. *DesRoches v. U.S. Postal Serv.*, 631 F.Supp. 1375 (D.N.H.1986). A genuine issue affects the outcome of the litigation. *Hahn v. Sargent*, 523 F.2d 461 (1st Cir.

1975), *cert. denied,* 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754.

The parties have not challenged the authenticity of the documentation attached to the cross-motions for summary judgment, therefore we will act accordingly in our consideration of the case. The arguments of the parties, *supra,* manifest no dispute about the material facts of this adversary proceeding. Our examination of the exhibits and affidavits attached to the complaint and the parties' memoranda leads us to conclude the factual record is complete for a legal ruling on the merits. While there is no disputed material fact in this case, we must still evaluate the facts presented and the legal inferences which should flow from them.

Bethlehem, in its papers, has conceded that the EIP Pool, a non-qualified trust for IRC and ERISA purposes, is property of the estate under 11 USC § 541. Accordingly, we will not discuss the issue of unqualified plans, and will Order that Bethlehem turnover to the Trustee, after hearing, the amount in the EIP Pool which is property of the estate.

What remains to be decided by us is whether Debtor's Shortfall Pool and ESOP funds are property of the estate, or whether they are excepted from the estate because they are post-petition earnings, 11 USC § 541(a)(6), or excepted under the spendthrift exception, 11 USC § 542(c)(2). Within the issues presented is the sub-issue of Federal preemption.

The collision of ERISA, the Bankruptcy Code, and State law provides an interface which is complex and ofttimes results in discussions which are both confusing and externally/internally contradictory. As a Court, however, we must strive to construe these statutory schemes so as to be consistent with each other. *See, e.g., United States v. Stauffer Chem. Co.,* 684 F.2d 1174, 1184 (6th Cir.1982), *aff'd on other grounds,* 464 U.S. 165, 104 S.Ct. 575, 78 L.Ed.2d 388 (1984). We must attempt to give effect to each statute, if it is possible to do so, while preserving their sense and purpose. *Watt v. Alaska,* 451 U.S. 259, 267, 101 S.Ct. 1673, 1678, 68 L.Ed.2d 80 (1981). This is not an easy task where ERISA and the Bankruptcy Code are involved. To aid us, there are contradictory rules of statutory construction we may choose to follow.

Some Courts have argued that a Court may presume that Congress intends for narrower, more specific statutes to take precedence over contrary general one, regardless of their temporal sequence. *See, e.g., Busic v. United States,* 446 U.S. 398, 406, 100 S.Ct. 1747, 1752, 64 L.Ed.2d 381 (1980). If we were to follow this rule, ERISA would prevail over the Bankruptcy Code. Application of this general principal does not end our discussion because many Courts have held the Bankruptcy Code take precedence over ERISA.

Another guide to statutory interpretation provides that general statutes may prevail over specific ones, if, but only if, the Court finds a clear Congressional intention supporting that result. *Crawford Fitting Co. v. J.T. Gibbons, Inc.,* 482 U.S. 437, 445, 107 S.Ct. 2494, 2499, 96 L.Ed.2d 385 (1987). This rule provides us with no help because many cases directing that the Bankruptcy Code prevails over ERISA do not show that Congress had a clear intent to override ERISA in bankruptcy.

Finally, there is a rule we call "the last enacted, the first in right rule." It is also known by other names, but it rules that the last statute enacted should prevail over an earlier enacted statute because when the latter statute was enacted Congress would have had the earlier statute in mind, and if it remained silent during the latest enactment, then it intended by implication to overrule or modify the older statute. In this matter, ERISA would prevail because it was modified last.[27] This rule imputes too much knowledge to Congress. Accordingly, we must start with an analy-

---

**27.** The Bankruptcy code was amended on June 29, 1984, but the anti-alienation provisions of ERISA were amended by the Retirement Equity Act of 1984; Pub.L. No. 98–397 on August 13, 1984.

sis of the entire spectrum of the ERISA/Bankruptcy interface to resolve this summary judgment motion.

The Circuit View.

Although the Seventh Circuit has not addressed the issue of whether Debtor's profit-sharing and ESOP funds are § 541 property of the estate and whether the subject funds are excepted from becoming property of the estate under 11 USC § 541(a)(6) or § 541(c)(2), there are several Seventh Circuit cases discussing ESOP and profit-sharing plans which are helpful to an understanding of the ERISA/Bankruptcy interface.

In *Matters of Crippin and Bruce*, 877 F.2d 594 (7th Cir.1989), the Seventh Circuit reversed the lower Court's holding that allowed Chapter 13 debtors to reject their agreements to participate in an ESOP as an 11 USC § 365 executory contract. The Seventh Circuit ruled that the debtors were not permitted to discontinue their participation in the ESOP and receive in its place higher wages to fund their Chapter 13 plan. We note that none of the parties here raised or considered the executory contract issue addressed by the *Crippin* Court. The *Crippin* Court stated in a footnote that it would not approach the issue now before us:

> 2. Given our disposition of the case, we need not reach PIE's [debtors' employer's] contention that the SIP [employee stock investment program] is a spendthrift trust under Illinois law and therefore not part of Bruce's and Crippin's bankruptcy estates. *See* 11 U.S.C. § 541(c)(2) (making non-bankruptcy law restrictions on the transfer of beneficial interests enforceable in bankruptcy cases).

*Id.*, at 598. (brackets supplied).

In *Crippin*, the debtors/employees' collective bargaining agent negotiated with their employer and established an employee stock investment plan (SIP). The employer established the SIP as an ESOP, which was to run from October 7, 1985 through December 1, 1990, under ERISA. To be eligible to participate in the SIP, the employees had to agree to irrevocably accept a 15% wage reduction over the SIP's life. In return, the employer agreed to fund the SIP with common stock. Only the employer could terminate the SIP at any time which, in turn, would end the wage reduction. Each participating employee earned stock for actual days worked and such stock was placed in the employee's account. Shares contributed by the employer were not tied directly to the amount that employee wages were reduced. The employer had hoped to curb operating expenses by reducing the employee's payroll and also hoped to increase productivity by giving the employees a stake in the company.

The debtors in *Crippin* sought, as part of their Chapter 13 plans, to reject their participation in the SIP as of the date of filing their bankruptcy petitions. By rejecting their future participation in the SIP, the debtors sought to avoid the 15% wage reduction and, in turn, desired to be paid the wages they would have received had they not agreed to the reduction. The *Crippin* Court framed the issue.

> We must decide whether Bruce and Crippin [Chapter 13 debtors] could reject their participation in the SIP as an executory contract and force PIE [employer] to restore their wages to pre-reduction levels.

*Id.*, at 596 (brackets supplied). The Court held:

> We think, however, that it was error to treat the SIP as simply a contract to buy and sell stock. Instead, the SIP is a part of PIE's compensation system, and thus an integral part of the entire employment relationship.... Although the courts below thought that PIE was required to invest the 15 percent the SIP participants gave up in PIE stock ... the stock's value bears no direct relationship to the value of wages the employees give. Also, when the SIP participants agreed to reduce their wages, they also agreed to reduce their wage-based fringe benefits—including incentive compensation, vacation and holiday pay, and short-term disability benefits—because PIE based those benefits on the participants'

reduced wages, not on the wages they would have received if they had elected not to participate in the SIP. These facts indicate that the wage reduction really was a wage reduction and not simply part of a contract to purchase stock through payroll deductions. In other words, the SIP was an alternative form of compensation to straight wages.

Bruce and Crippin could not reject the SIP while accepting the other benefits their reemployment provided them....

When a debtor rejects a contract he rejects his obligation to perform under the contract and to receive benefits that go along with that performance.... But at the time Bruce and Crippin elected to participate in the SIP, they had to choose how they wanted PIE to compensate them for their work: by not joining the SIP, they could choose to be compensated strictly in cash ...; by joining the SIP, they could choose to be compensated partly in cash and partly in stock to be held in trust for their future benefit.... Bruce and Crippin are really asking the courts to change the form of their compensation.... This the courts may not do. While bankruptcy courts have the power to allow debtors to *escape* burdensome contracts by rejecting them, bankruptcy courts do not have the power to rewrite contracts to allow debtors to continue to perform on more favorable terms.... Once they chose to accept cash wages and stock as compensation, Bruce and Crippin could not unilaterally modify their agreement to choose straight wages.

*Id.,* at 597–598 (citations omitted). (Emphasis in original)

In *Matter of Kochell,* 732 F.2d 564 (7th Cir.1984), the Seventh Circuit affirmed both the Bankruptcy Court's and District Court's determination that payments made by a 44 year-old medical doctor, a chapter 7 debtor, to two pension funds are not exempt, because these funds are not "reasonably necessary for the support of the debtor [or] any dependent," as required under 11 USC § 522(d)(10)(E).

The Kochell Court refused to address Dr. Kochell's contention, raised for the first time on appeal.

[T]he words 'reasonably necessary' should not be construed so restrictively as to destroy the inalienability of qualified plans under the [IRC]. As support for his argument, he points to § 522(b)(2)(A), which provides that, if a debtor chooses state exemptions, he may also look to exemptions provided by other, non-bankruptcy, federal law. Dr. Kochell argues that his choice of the federal exemption scheme should not amount to a waiver of rights he might have had in funds under the tax laws.

*Id.,* at 566. The Seventh Circuit concluded that because Dr. Kochell elected the Federal exemption scheme over others to which he may be entitled, "we do not believe that the treatment these plans might have received under the state law option has any relevance to their proper disposition under § 522(d)(10)(E)." *Id.,* at 566. In *dicta,* the Seventh Circuit responded to Dr. Kochell's argument against destroying the inalienability of qualified plans under the IRC.

To the extent the debtor is arguing that the funds are not properly part of the bankruptcy estate, either because they are inalienable, or for some other reason, his argument is rejected. Property of the estate is defined in 11 U.S.C. § 541(a)(1) as any interest, either legal or equitable, of the debtor in property. The funds from one of the plans at issue in this case have been rolled over into an Individual Retirement Account. Such accounts are clearly includable in the estate.... Furthermore, while a different result was often reached under § 70 of the old Bankruptcy Act, it is clear that since the advent of § 541(a)(1), 'most, if not all, pension plan funds are included in the estate.'

*Id.,* 732 F.2d at 566, n. 3 (citations omitted). *See, Matter of Kochell,* 804 F.2d 84 (7th Cir.1986) (*Kochell II*) (Seventh Circuit characterized *Kochell I* as holding that "the Trustee may reach the assets in the IRA for the benefit of debtor's creditors." *Kochell II,* 804 F.2d at 84. *Kochell II* held the trustee was not only liable to the IRS

for the income tax on the withdrawn asset, but also the 10% penalty tax).

In *Humprey, III v. Buckley (In re Swanson)*, 873 F.2d 1121 (8th Cir.1989), the Eight Circuit affirmed the lower court's order directing the State of Minnesota to turnover proceeds from a Teachers Retirement Fund (TRA) to the bankruptcy trustee of certain debtor teachers. The issue raised in *Swanson* was whether the mandatory contributions made by the debtors and the State to a statutorily created retirement fund are property of their bankruptcy estates.[28] The applicable Minnesota statute provided for numerous restrictions on alienability or transferability of any beneficial interest the debtor may have in the TRA Funds, provided that funds remained property of the State until actually paid, prohibited any assignment of a teacher's or teacher's beneficiary interest in to the TRA Fund and, voided any levy by a creditor on the TRA Funds.

Despite the absence of Minnesota State law on the attributes of spendthrift trust, the *Swanson* Court construed § 541(c)(2) narrowly and noted the fatal absence of "traditional" spendthrift characteristics. Contributions were being made by the debtors, the debtors could control trust assets, albeit with limits, and could demand refund of their contributions to the TRA Fund by terminating their employment.

While we recognize that Minnesota law restricts a TRA member's ability to assign TRA Funds in language akin to that found in most spendthrift trusts, we con-

clude that retirement plans such as the one involved in this case were not intended to be excluded from the bankruptcy estate. Section 541(c)(2) was intended to exclude a debtor's beneficial interest in a 'traditional' spendthrift trust, not a statutory retirement fund.

*Id.*, 873 F.2d at 1123. *But see, Hovis v. Wright*, 751 F.2d 714, 716 (4th Cir.1985) (assuming, but not deciding, a Chapter 7 debtor teacher's contributions to a retirement fund are property of the estate, held the contributions were exempt under § 522 in view of clear and unambiguous legislative intent expressed in statute creating the retirement fund although not expressly listed under the State's exemption law).

The *Swanson* Court relied on its earlier decision in *Samore v. Graham (In re Graham)*, 726 F.2d 1268 (8th Cir.1984). In *Graham*, Dr. Graham was a Chapter 7 debtor and a trustee of an ERISA qualified profit sharing plan in which he had an interest. The Bankruptcy Court ordered him to turn over the plan trust funds for inclusion in the estate and denied his claimed exemption. For reversal, Dr. Graham argued that the anti-alienation provision in the trust instrument, required by ERISA, excluded the trust funds from the bankruptcy estate under § 541(c)(2), and alternatively, ERISA created an exemption for the trust funds under § 522(b)(2)(A).

The *Graham* Court examined § 541(c)(2)'s legislative history,[29] and concluded:

---

**28.** In *dicta*, the *Swanson* Court noted that the debtors had elected the Federal exemption scheme and chose to exclude the funds from the bankruptcy estate under § 541(c)(2), rather than the Minnesota State exemption where "it is clear that had the debtors selected the exemption under Minnesota law the retirement funds in this case would have been exempt." *Id.*, 873 F.2d at 1122.

**29.** The legislative history of 11 USC § 541(c)(2), in pertinent parts, follows:

Subsection (c) invalidates restrictions on the transfer of property of the debtor, in order that all of the interests of the debtor in property will become property of the estate. The provisions invalidated are those that restrict or condition transfer of the debtor's interest, and those that are conditioned on the insol-

vency or financial condition of the debtor, on the commencement of a bankruptcy case, or on the appointment of a custodian of the debtor's property. Paragraph (2) of subsection (c), however, preserves restrictions on transfer of a spendthrift trust to the extent that the restriction is enforceable under applicable nonbankruptcy law.

H.R.Rep. No. 95–595, 95th Cong., 1st Sess. (1977) pp. 367–369, 1978 U.S.Code Cong. & Ad. News at 5963, 6325. *But see,* S.Rep. No. 95–989, 95th Cong., 2d Sess. (1978) 83, *reprinted in* 1978 U.S.Code Cong. & Ad.News 5787, 5869.

Section 541(c)(2) follows the position taken in the House bill and rejects the position taken in the Senate amendment with respect to income limitations on a spend-thrift trust. 124 Cong. Rec. H 11096, H 11114 (daily ed. Sept. 28, 1978); S17413 (daily ed. October 6, 1978).

There is no indication whatever that Congress intended § 541(c)(2) to be a broad exclusion which would apply to keep all debtors' entire ERISA plan benefits out of the estate. To the contrary, pension benefits are specifically treated under the Code's *exemption* provision, clearly indicating that they were intended and assumed to be part of the estate.

*Id.*, at 1272. (emphasis in original).

The *Graham* Court noted that under the old Bankruptcy Act, § 70(a)(5), 11 USC § 110(a)(5) (repealed 1978),[30] property of the estate was defined in terms of "transferability or leviability." *Id.*, 726 F.2d at 1271. Under the transferability or leviability standard, a debtor's interest in a spendthrift trust was not part of the estate if that interest could not be transferred under applicable State law. *Id.*, at 1271. Thus, exempt property did not pass to the trustee under the Bankruptcy Act. Under § 541 of the Bankruptcy Code, however, the "transferability or leviability standard" was abandoned to now include all property as property of the estate unless either expressly excepted under the Code or the debtor properly exercised an exemption.[31] The Court found an intent to include ERISA plans and buttressed its holding with the conclusion that because pension benefits are exempt under § 522(d) they were intended to be part of the estate. *Graham* reasoned that Congress' failure to include ERISA, on a non-exhaustive list contained in the legislative history of 11 USC § 522(b)(2)(A),[32] demonstrates that Congress did not intend to include ERISA plans with the other "Federal law" exemptions of § 522. Thus, the *Graham* Court concluded the plan's anti-alienation provision required by ERISA and the IRC is not within the § 522(b)(2)(A) class of Federal exemptions in a bankruptcy proceeding.

**30.** Section 70(a)(5) of the Bankruptcy Act formerly provided:

(a) The trustee of the estate of a Bankrupt … shall … be vested by operation of law with the title of the bankrupt as of the date of the filing of the petition [to] … (5) property, including rights of action, which prior to the filing of the petition he could by any means have transferred or which might have been levied upon and sold under judicial process against him, or otherwise seized, impounded or sequestered. . . .

**31.** The House Report accompanying their bill, H.R. 8200, explains:

The bill makes significant changes in what constitutes property of the estate … The bill determines what is property of the estate by a simple reference to what interests in property the debtor has at the commencement of the case. This includes all interests … whether or not transferable by the debtor. . . . The bill … continues over [from the Act] the exclusion from property of the estate of the debtor's interest in a spendthrift trust to the extent the trust is protected from creditors under applicable State law. The bankruptcy of the beneficiary should not be permitted to defeat the legitimate expectations of the settlor of the trust.

H.R.Rep. No. 595, 95th Cong., 1st Sess. 175–76 (1977), *reprinted in* 1978 U.S.Code Cong. & Ad. News 6136.

**32.** The House and Senate Reports on the "Federal law, other than subsection (d)" provision in 11 USC § 522(b)(2)(A), provides the following non-exhaustive list of pensions, wages, benefits and payments of a particularly Federal nature as opposed to ERISA which regulates private employer pension systems:

Subsection (b), the operative subsection of this section, is a significant departure from present law. it permits an individual debtor in a bankruptcy case a choice between exemption systems. The debtor may choose the Federal exemptions prescribed subsection (d), or he may choose the exemptions to which he is entitled under other Federal law and the law of the State of his domicile. If the debtor chooses the latter, some of the items that may be exempted under the other Federal laws include:
—Foreign service Retirement and Disability payments, 22 U.S.C. 1104;
—Social security payments, 42 U.S.C. 407;
—Injury or death compensation payments from war risk hazards, 42 U.S.C. 1717;
—Wages of fishermen, seamen, and apprentices, 46 U.S.C. 601;
—Civil service retirement benefits, 5 U.S.C. 729, 2265;
—Longshoremen's and Harbor Worker's Compensation Act death and disability benefits, 33 U.S.C. 916;
—Veterans benefits, 45 U.S.C. 352(E);
—Special pensions paid to winners of the Congressional Medal of Honor, 38 U.S.C. 3101; and
—Federal homestead lands on debts contracted before issuance of the patent, 43 U.S.C. 175.

H.Rep. No. 595, 95th Cong., 2d Sess. 360 (1977) *reprinted in* 1978 U.S.Code Cong. & Ad.News 5963, 6316; S.Rep. No. 989, 95th Cong., 2d Sess. 75, *reprinted in* 1978 U.S.Code Cong. & Ad.News 5787, 5861.

In *Goff v. Taylor (Matter of Goff)*, 706 F.2d 574 (5th Cir.1983), the Chapter 7 joint debtors, husband and wife, sought to exempt their self-employed retirement (Keogh) plans under § 541(c)(2). The trust agreement voided any attempt to alienate except to such extent as may be required by law. Although never used by Dr. Goff, the trust agreement permitted a withdrawal subject to the ten percent (10%) tax penalty exacted under the IRC. The debtors in *Goff* selected the State exemption option which did not provide an exemption for Keogh plans as does the Federal exemption under § 522(d)(10)(E).[33]

The *Goff* Court began its analysis by discussing the restyled scope of property of the estate from the Bankruptcy Act to the Bankruptcy Code. "This is so 'notwithstanding any provision [except as recognized in subsection (2)] that restricts or conditions transfer of such interest by the debtor.'" *Id.*, 706 F.2d at 578, *citing* 11 USC § 541(c)(1)(A). *Goff* also noted the distinction between property that is exempted under § 522 and excluded under § 541(c)(2), *i.e.*, the former comes into the estate but is subsequently excluded while the latter never enters the estate.

The *Goff* Court rejected the debtors' contention that, in addition to traditional State spendthrift trust law, the Bankruptcy Code's reference to "applicable nonbankruptcy law" was also intended to encompass similar Federal restrictions such as ERISA because ERISA's restrictions on assignment and alienation of qualified trusts were similar to restrictions placed by States on spendthrift trusts. 26 USC § 401(a)(13); 29 USC § 1056(d)(1). *Goff* outlined a three step approach to this issue:

First, we examine the explicitly narrow legislative intent behind the facially broad reference in Section 541(c)(2) to 'applicable nonbankruptcy law.' Second, we consider the overall congressional scheme embodied in the Bankruptcy Code, particularly the exemption system election provision, Section 522, which directly addresses the degree to which pensions may therein be exempted and also explicitly references 'federal law' and ERISA. Third, we assess the relationship and effect upon ERISA of the intent of the Bankruptcy Code. The indicia of legislative intent, along with existing case law, lead to the inexorable conclusion that Section 541(c)(2)'s reference to 'applicable nonbankruptcy law' was an acknowledgement of traditional state spendthrift trust law, and not of ERISA.

*Id.*, 706 F.2d at 581. Concluding that § 541(c)(2) was intended to exempt only spendthrift trust assets from the estate, *Goff* determined that the debtor's "self-settled" Keogh plan did not meet the traditional non-access and non-control test for spendthrift trust and affirmed the Bankruptcy Court's inclusion of the pension trust funds in the estate.

In *Brooks, M.D. v. Interfirst Bank, Fort Worth (Matter of Brooks)*, 844 F.2d 258 (5th Cir.1988), the Chapter 11 debtor attempted to exclude his vested interest in an ERISA–qualified pension plan from the bankruptcy estate. The plan was created by a professional association in which the debtor was a voting member. Dr. Brooks partially owned and controlled the association and his earnings partially funded the plan. The plan was used for "the exclusive benefit of the participants and their beneficiaries." The plan permitted investment of plan contributions in mutual investment plans and extended hardship loans, and upon termination of employment with the association, the debtor was entitled to receive the entire amount then standing to his credit. The *Brooks* Court defined the issue as whether Dr. Brooks' interest is protected from bankruptcy creditors as a valid spendthrift trust under Texas law.[34]

---

**33.** After the Fifth Circuit's decision in *Goff v. Taylor (Matter of Goff), supra*, 706 F.2d 574 (5th Cir.1983), Texas amended its property code, effective September 1, 1987, to exempt the assets of all plans qualified under Federal tax law. Tex.Prop.Code Ann. § 42.0021 (Vernon Supp. 1988). *See, Heitkamp v. Dyke (In re Dyke)*, 99 B.R. 343, 347 (Bkrtcy.S.D.Tex.1989).

**34.** The *Brooks* Court fixed August 1985 as the operative date to determine Dr. Brook's interest in the ERISA trust and determined the 1987 amendment, footnote 33 *supra*, was not retroactive. *Id.*, 844 F.2d at 261.

The Court determined that two principle characteristics of the plan were fatal—the debtor's ownership and control in the association acting as settlor; and, the debtor's earnings partially funding the trust. *Brooks* reached its holding because the following policy limitation applied to a valid spendthrift trust:

> Like all other states that recognize spendthrift trusts ... Texas forbids a person to place his own assets in trust and then, by a spendthrift clause or some other restraint, to shield the trust from claims of his current or future creditors. A person is not allowed to make provisions for his own support or comfort to the prejudice of his creditors.

*Id.,* 844 F.2d at 263 (footnotes omitted).

In *Daniel v. Security Pacific National Bank (In re Daniel),* 771 F.2d 1352 (9th Cir.1985), *cert. denied,* 475 U.S. 1016, 106 S.Ct. 1199, 89 L.Ed.2d 313 (1986), Dr. Daniel was employed by his own professional corporation and was its sole director and shareholder. The corporation formed a pension and profit-sharing plan that was managed and controlled by the debtor. The debtor was one of four beneficiaries under the plan. The IRS approved the plan as IRC–qualified because the plan contained the standard anti-alienation and anti-assignment provisions required under ERISA and the IRC. The plan permitted, *inter alia,* access to the accrued beneficial interest after five years of employment or upon termination of employment; amendment or discontinuance at will by the employer (*i.e.,* the debtor); and finally, the debtor was permitted to borrow on an unsecured basis with virtually no constraints on repayment.

The *Daniel* Court held that the plan was not exempt under State law because it did not qualify as a retirement plan. *Daniel* followed *Graham, supra, Goff, supra,* and *Lichstrahl, infra,* to conclude that the anti-alienation and anti-assignment prohibitions derived from the ERISA and IRC provisions of Dr. Daniel's pension and profit-sharing plan do not make the plan exempt under § 522(b)(2)(A) or exclude it from becoming property of the estate under

§ 541(c)(2). *See, Lichstrahl v. Bankers Trust (In re Lichstrahl),* 750 F.2d 1488 (11th Cir.1985).

In a Chapter 13 context, the Second Circuit in *Regan v. Ross,* 691 F.2d 81 (2d Cir.1982), addressed the issue of whether three New York State employee pension beneficiaries may require their pension systems to transfer a portion of their monthly benefits for distribution to creditors under a Chapter 13 plan. The Second Circuit concluded: 1) that the State law prohibition against assignment to creditors does not prevent pension benefits from being property of the estate in a Chapter 13 proceeding; and, 2) that "§ 541(c)(2) ... was not intended to bar the use of such benefits in a voluntary repayment plan confirmed under Chapter 13." *Id.,* 691 F.2d at 83. The *Regan* Court also stated that the use of these funds in this manner did not disqualify the State retirement system under the IRC. The Court cited the applicable legislative history showing that the "new" Bankruptcy Code's all inclusive definition of estate property was a substantial departure from the former Bankruptcy Act. *Regan* noted that not only is § 541 property included in a Chapter 13 debtor's estate, but also, under 11 USC §§ 1306(a), (a)(1), all benefits received throughout the pendency of the Chapter 13 case are included. *Regan* rejected the systems' argument that the anti-alienation provision's operation is saved by the Code's § 541(c)(2) exception, holding that the argument runs counter to congressional intent as "evinced by both specific legislative history and reasonable inferences drawn from other Code provisions." *Id.,* 691 F.2d at 84. For example, Congress explicitly broadened the class of Chapter 13 debtors to include pension and welfare recipients in addition to wage earners and, in contrast, the legislative history to § 541(c)(2) refers only to spendthrift trusts.

In *McLean v. Central States, Southeast and Southwest Areas Pension Fund (In re McLean),* 762 F.2d 1204 (4th Cir.1985), the Chapter 13 debtor obtained a Bankruptcy Court order which provided that part of his pension payments be used to fund his Chapter 13 plan. Opposition was raised

that the order would require the pension fund to violate its anti-assignment provision, and that it might thereby lose both its ERISA qualification and its tax exempt status. This position was supported by the Commissioner of the Internal Revenue as *amicus.* The *McLean* Court concluded that the anti-alienation provision was enforceable under Illinois law as a valid spendthrift because:

> [t]he ... pension fund is not one of those which because settled and revocable by a beneficiary, may not on that account for public policy reasons be protected against the claims of the beneficiary's creditors by anti-assignment provisions.... Contributions to the [fund] are made only by employers and the employees have no power to revoke the trust and reach its corpus. Public policy concerns would not therefore prevent enforcement of this restriction under controlling nonbankruptcy state law.

*Id.,* 762 F.2d at 1207 (citations omitted, brackets supplied).

The *McLean* Court rejected the Chapter 13 trustee's contention that the debtor's interest in the trust fund was estate property and sided against the premises adopted by the Circuit Courts in *Ross* and *Graham, supra* of automatic inclusion unless excluded or exempted. Instead, *McLean* adopted the *Goff* approach.

> [W]e believe that whether a particular pension fund interest subject to transfer restrictions is initially included in estate property is wholly determined by whether, per § 541(c)(2), the restriction is enforceable under applicable nonbankruptcy law, including any public policy concerns that might make unenforceable a restriction in a pension plan settled and revocable by a beneficiary.

*McLean, supra,* 762 F.2d at 1208.

In *Clark v. O'Neill (In re Clark),* 711 F.2d 21 (3d Cir.1983), the Chapter 7 debtor, a 37 year old practicing physician, appealed an order denying his claim to exempt his Keogh plan under § 522(d)(10)(E). Contributions to the Keogh plan were tax deductible and its earnings were tax-deferred until withdrawn. Funds could be withdrawn without penalty at the age of 59.50 years, upon death, or when a participant became disabled. If funds were withdrawn before these events, a participant had to pay a tax penalty and would be barred from contributing to the fund for five years. The parties did not dispute the funds were property of the estate under § 541 or that they were exempt as a matter of State law. The Bankruptcy Court held the debtor's exemption claim did not fall within the literal terms of § 522(d)(10)(E) because he "had no present right to receive payments from the plan." *Id.,* at 22. The *Clark* Court perceived a Congressional intent to alleviate present rather than long-term need as part of the debtor's fresh start. Accordingly, *Clark* upheld the denial of the debtor's claim to exempt his Keogh plan.

> The general purpose of the exemption provisions of the Bankruptcy Code is to give debtors a fresh start.... The exemption of present Keogh payments, to the extent they are necessary for the support of the debtor, is consistent with this goal. The exemption of *future* payments, however, demonstrates a concern for the debtor's long-term security which is absent from the statute.

*Id.,* 711 F.2d at 23 (emphasis in original). *But see id.,* at 24, Judge Becker concurring:

> I have substantial doubts that the majority has correctly assessed congressional intent.... The majority's holding will not affect employee pension and annuity plans created by employers, because the assets of such plans would not be included in the debtor's estate under section 541.... The assets of Keogh plan, in contrast, are clearly assets of the estate. Thus Congress' putative lack of concern for the long-term security of the debtor works to the detriment only of self-employed debtors—a result I find inconsistent with Congress' manifest solicitude for retirement benefits for self-employed individuals.

Indiana Precedent.

In *Miller v. Lincoln National Bank and Trust Company (Matter of Cook),* 43 B.R.

996 (N.D.Ind.1984), the District Court reversed the Bankruptcy Court's refusal to order a turnover of the debtor's retirement benefits to the bankruptcy estate. The debtor was a participant in his employer's savings and profit sharing plan which required contribution from both the employer and the debtor. The debtor's contribution consisted of a fixed percentage of his post-tax salary. Under the plan's terms, the debtor could not resign or withdraw from participation in the plan unless his employment was terminated, he reached the age of sixty, he died prior to reaching age sixty. He could also request distribution based on hardship. The plan contained an anti-alienation clause which forbade creditors from reaching the assets of the plan and was qualified for ERISA and tax benefits under the IRC.

The *Cook* Court began its analysis with a finding that the Bankruptcy Court had erroneously relied on standards set by the Bankruptcy Act § 70(a)(5), *supra*. Under § 70(a)(5), the determination of whether a particular asset was exempt was based on its nature, with an emphasis on whether the asset related to the debtor's past or future. If the asset related to the debtor's future, then it was exempt. The Bankruptcy Code § 541(a)(1) changed that approach.

> It is clear that Congress intended that the scope of property interests included in the bankruptcy estate under § 541(a)(1) be broad, while the scope of the exclusions from the bankruptcy estate be narrow. Having examined the legislative history of § 541(c)(2) and having examined other courts' considerations of § 541(c)(2), this court concludes that the exclusion should be narrowly drawn. Section 541(c)(2) is an exception designed to apply to spendthrift trusts.

*Id.*, 43 B.R. at 999, *citing, inter alia, Graham* and *Goff, supra.*

Identifying the issue, the *Cook* Court commented:

The controversy arises under § 541(c)(2) when courts confront the issue of whether ERISA-qualified plans which impose restrictions on the transfer of beneficial interests of debtors in a trust fit within the terms of § 541(c)(2).

*Id.*, 43 B.R. at 999–1000. *Cook* noted that this issue was further complicated by the fact that the Federal exemption under § 522(d)(10)(E) appears to apply more specifically to ERISA-qualified plans. Indiana, however, has opted out of the Federal scheme.

*Cook* found that an interest in an employee benefit plan is property and that it was the debtor's burden to establish the plan meets Indiana's definition of spendthrift trust.

> The State of Indiana specifically provides that an interest in an employee benefit plan is property. I.C. 32–3–2–1.[35] It is clear, then, that an interest in an employee benefit plan would be included in the § 541(a)(1) definition of property. It is up to a particular debtor who is domiciled in the State of Indiana to raise the issue of whether the specific plan involved fits under the exception of § 541(c)(2). For a particular plan to come within the terms of § 541(c)(2), it must be demonstrated that the plan meets the definition of spendthrift trusts as defined by statutory and case law in the State of Indiana.... ERISA-qualified plans can come under the exception of § 541(c)(2), but only if the ERISA-qualified plan can meet the definition of spendthrift trust in that specific state. In the determination of whether a particular plan fits within the exception of § 541(c)(2), state law controls, not ERISA.
>
> This court concludes that the exception of § 541(c)(2) is met only by reference to applicable state nonbankruptcy law because to do otherwise would appear to be contrary to the legislative history and

**35.** Indiana Code 32–3–2–1, *Property, definitions*, provides in pertinent parts:

As used in this Chapter: ...

*Property* means tangible or intangible property, regardless of its location, that is either real or personal. The term includes: ...

(2) An interest in an employee benefit plan. [I.C. 32–3–2–1, as added by P.L. 293–1983, § 1].

would appear to render meaningless the federal exemption provided under § 522(d)(10)(E). By crafting a rule which allows debtors the opportunity of excepting their ERISA-qualified plans if they can prove that the plan meets the state definition of a spendthrift trust, the court gives effect to the important public policy behind the Bankruptcy Code and its concept of property. This construction of § 541(c)(2) appropriately balances important competing interests. Such a construction insures that § 541(c)(2) will remain a limited exception as most state definitions of spendthrift trusts are narrow in scope.

*Cook, supra,* 43 B.R. at 1000 (citations omitted).

*Cook* determined that Indiana recognizes spendthrift trusts, and that, to be valid, two terms were required: first, the settlor cannot be a beneficiary, otherwise the creditors can reach the trust's corpus;[36] and second, under I.C. 30–4–3–2(a), a spendthrift trust must contain a clause barring any beneficiary from voluntarily or involuntarily transferring his interest in the trust. Underlying both of the foregoing elements is the issue of the extent of the "dominion and control a beneficiary possesses over the trust corpus." *Id.,* 43 B.R. at 1000. In *Cook,* there was no question that an anti-alienation clause was present. As to the first element of whether the spendthrift prohibition on self-settled trusts was violated by the plan's requirement that the debtor contribute to the plan to receive the employer's contribution, *Cook* refused, on public policy grounds, to hold the self-settled aspect of the plan caused the employee to be considered a settlor as a matter of law:

> It is clear that in ERISA-qualified plans which are set up by employers to assist in aiding its workers to secure a means of support when its workers are no longer able to work, it is the employer who is the settlor of the trust, not the employee. Where an ERISA-qualified plan set up by an employer requires an employee to make contributions to the plan as part of the employee's participation, the employee cannot be considered a settlor as that term is traditionally used in the area of spendthrift trusts. The court specifically limits this holding to contributions of employees which are required by the employer establishing the trust.

*Id.,* 43 B.R. at 1001.

The debtor's ERISA-qualified trust failed, however, to survive the key issue of access, *i.e.,* the extent of a beneficiary's dominion or control over the corpus, and thus, remained property of the estate.

> The key issue is the extent of dominion and control the debtor possesses over the corpus. This issue effectively translates to one word: access. An examination of the withdrawal provisions of this plan ... reveals that the debtor has present access to his portion of the trust corpus. The plan contains a hardship clause which, in effect, makes debtor's portion of the plan available to the debtor for current use. Hardship under the plan includes a need for funds because of illness or death, a need for funds for the education of children, or a need for funds for the purchase of a family residence. The foregoing hardship examples are not exclusive under the plan. It appears evident in this case, by virtue of the debtor filing bankruptcy, that the debtor was in need of funds due to his need of relief from financial hardship.[37] The employer's plan functions more like a savings program than a spendthrift trust. Debtor's right of withdrawal bars debtor from claiming the § 541(c)(2) exception. Debtor's interest in his employer's ERISA-qualified plan is property of the debtor's estate pursuant to § 541(a)(1) and must be turned over to the Trustee.

**36.** As discussed, *infra,* I.C. 30–4–3–2(c) was added in 1987 to eliminate the self-settled disqualification aspect of ERISA-qualified and IRC-qualified trusts that otherwise meet the remaining elements of a spendthrift trust.

**37.** It should be noted here that the parties in the matter *sub judice,* agreed that the hardship provision is not applicable because of Debtor's continued employment. In any event, the hardship exception in *Cook* is much broader than in our case.

In order for an ERISA-qualified plan to meet the § 541(c)(2) exception, the debtor-beneficiary cannot possess any present access to his interest in the plan at the time bankruptcy is filed. The determination ... must be made on a case by case basis.... [t]he court concludes that the prime requirement a plan must possess to fit within the § 541(c)(2) exception ... is that the participant/beneficiary cannot possess any means, when bankruptcy is filed and the bankruptcy estate is thus created, along with the trustee's powers, by which the participant could gain access to the funds.

*Id.,* 43 B.R. at 1001–02 (citations omitted).

In a companion case decided on the same day as *Cook, Miller v. Jones (Matter of Jones),* 43 B.R. 1002 (N.D.Ind.1984), the District Court repeated its discussion in *Cook* but affirmed the Bankruptcy Court's ruling excepting the funds from becoming property of the estate because the debtor lacked access to the funds. In *Jones,* the debtor's ERISA-qualified plan was similar to that in *Cook, i.e.,* contributions were made by both the employer and employee; the debtor was required to contribute a fixed amount of his post-tax salary; the plan qualified under ERISA and the IRC; and, the plan contained an anti-alienation clause forbidding creditors from reaching the assets of the plan. But *Jones'* plan differed from the *Cook* plan in several material respects. First, the debtor could withdraw from participation in the plan. Second, no amounts contributed to the pension plan could be withdrawn as long as the debtor remained employed. Third, payments to plan participants occurred when their employment was terminated, the participant retired, died, or became disabled. The *Jones* Court found the debtor's portion of the plan was "not available to this debtor for current use." "The Employer's plan functions as a spendthrift trust." *Id.,* 43 B.R. at 1007.

In *Matter of Gifford,* 93 B.R. 636 (Bkrtcy.N.D.Ind.1988), Dr. Gifford was the sole shareholder, director, and employee of a professional corporation. The professional corporation was the settlor and administrator of an ERISA-qualified and IRC-qualified retirement plan with Dr. Gifford as its sole beneficiary. Amendment or termination of the plan could be accomplished at any time in Dr. Gifford's "sole and final discretion." Upon termination, Dr. Gifford, as administrator, could direct a distribution of the trust's assets in a lump sum or any other reasonable manner. The plan contained a clause that restricted the assignment or alienation of the beneficiary's interest. Bearing in mind Indiana's paltry $100.00 exemption under Ind.Code Ann. § 34-2-28-1, the *Gifford* Court determined that the real issue was whether the debtor's interest was excepted under § 541(c)(2) from being property of the estate. *Gifford* noted that the Indiana Legislature recently amended its trust code to add subsection (c) to I.C. 30-4-3-2. Subsection (c) eliminated the self-settled prohibition for those trusts that otherwise meet the spendthrift trust requirements and are ERISA/IRC-qualified. Given the anti-alienation clause in the plan and the former prohibition against self-settlement via qualification under ERISA and IRC, all that remained for the *Gifford* Court to examine was the "access" element derived from the *Cook* and *Jones* decisions, *supra.* The Court held the debtor's interest in the plan was not excepted under § 541(c)(2) because Dr. Gifford had virtually unlimited access to the funds, and accordingly ordered all but the $100.00 exemption into the estate. To reach this conclusion, the *Gifford* Court stated:

We are persuaded, however, that a more holistic approach is appropriate. The situation must be examined in all three dimensions and under a full spectrum. While the bankruptcy estate does not succeed to the powers a debtor may exercise solely for the benefit of another, it does include those powers the debtor may exercise for its own benefit. To ignore these rights, simply because a debtor might be acting in a different capacity, fails to fully comprehend the realities of the situation.

Although the debtor may not have the authority to exercise dominion over the

trust as 'beneficiary,' the debtor clearly has such authority under the plan as trustee, settlor, employer, and administrator. In these different capacities, he can exercise control over the trust assets for his own benefit.... Thus, what comes into the bankruptcy estate is not only the property in which debtor has an interest, but also, the powers the debtor can exercise for its own benefit over property, regardless of the title debtor may be acting under.

*Id.*, 93 B.R. at 640 (citations omitted).

In *In re McVade*, 72 B.R. 560 (Bkrtcy.N.D.Ind.1987), we were confronted by a trustee's objection to a debtor's claimed exemption in an employee thrift plan. The plan was sponsored by the debtor's employer and was a profit sharing type plan that was ERISA-qualified. Enrollment in the plan was voluntary and the employee could terminate participation at any time. The employee's contribution was comprised of two types. One type allowed, with a limit of 5%, a deduction of before tax dollars from an employee's monthly salary. The employer would match the employee contributions dollar for dollar. The second contribution type provided that after completion of the before tax dollar contribution, the participant could supplement by deducting up to an additional 10% from his earnings, with total contributions not to exceed 15%. Only the employer matching contributions and its earnings required a 24 month waiting period before vesting 100%. All other contributions and their respective earnings "vested" immediately on deposit. The entire plan vested 100% on termination of employment, retirement, death, or disability. During active employment, an employee was restricted from making withdrawals from the fund by a dollar amount, to twice a year, or, by incurring penalties or suspension from the plan. The plan contained an anti-alienation clause.

We held in *McVade*, to the extent the debtor had an unrestricted and present right of access to certain funds, that the interest in the plan constitutes property of the estate. We also noted that the plan satisfied two of the then existing three elements to qualify as a spendthrift trust under Indiana law, *i.e.*, the debtor-beneficiary was not the settlor, and the plan contained an anti-alienation provision. The plan, however, did not weather the key issue set forth by *Cook* and *Jones, supra, i.e.*, prohibited access to the funds. In *McVade*, the plan's hardship provision permitted the debtor to request a withdrawal if she encountered extreme financial hardship. Although the plan did not define what circumstances that included, we determined the debtor's bankruptcy filing qualified. Although the debtor did not exercise the hardship option prior to the filing of bankruptcy, the right to gain access as of the date of the filing of bankruptcy, not its actual exercise, determined the applicability of the § 541(c)(2) spendthrift exception.

In *Matter of Berndt*, 34 B.R. 515, 9 CBC.2d 848 (Bkrtcy.N.D.Ind.1983), the ERISA/IRC-qualified plan established by the debtor's employer contained the standard anti-alienation clause; however, the debtor could withdraw some or all of the deposits and accretions without penalty simply by giving prior written notice. Again, the debtor's present right of access as of the· date of filing for bankruptcy brought the subject funds into § 541(a). Putting aside that part of the *Berndt* decision that was arguably rendered statutorily obsolete four years later by I.C. 30-4-3-2(c),[38] the Court made the following pertinent observation concerning the "access" requirement that remains good law today:

> Debtors argue that the ... Plan's anti-alienation provision precludes the debtors' funds from passing to the bankruptcy estate. However, courts have recog-

---

**38.** The *Berndt* Court decision was rendered before the 1987 amendment that eliminated the former prohibition against self-settled plans for otherwise ERISA and IRC qualified plans. The Court stated:

> [I]n the instant case the debtor deposited his contributions in the Fund for his own use, and he could and did withdraw those funds without restriction. Clearly he was both the settlor and beneficiary.

*Id.*, 34 B.R. at 518.

nized that Congress did not intend ERISA's provisions to supersede federal law. Furthermore, such provisions do not create a spendthrift trust or remove property from the estate. The basis of their decisions is that the debtors' complete right of withdrawal destroyed the spendthrift trust exception provided by § 541(c)(2), despite the inclusion of an anti-alienation clause.

*Id.,* 34 B.R. at 518 (footnote and citations omitted).

The *Berndt* Court followed, *inter alia, In re Di Piazza,* 29 B.R. 916, 10 B.C.D. 618, 620 (Bkrtcy.N.D.Ill.1983), for its proposition that the debtor's interest was part of the bankruptcy estate by weighing the extent of dominion and control the debtor had over the corpus of the ERISA plan. Accordingly, *Berndt* fashioned its order to the debtors to turn over only all present benefits they had as of the date of filing for bankruptcy.

In *Matter of Harter,* 10 B.R. 272 (Bkrtcy.N.D.Ind.1981) and *Matter of Haynes,* 9 B.R. 418 (Bkrtcy.N.D.Ind.1981), *aff'd,* 679 F.2d 718 (7th Cir.1982), *cert. denied, sub nom. Miller v. Haynes,* 459 U.S. 970, 103 S.Ct. 299, 74 L.Ed.2d 281 (1982), the Court was faced with military retirement benefits and analogized those benefits to exempt future wages, *i.e.,* earned after the filing of the petition:

The military retirement benefits in the case at bar are paid monthly on the contingency that the debtor is alive on the first day of each month. The military plan differs from other pension plans in that it is noncontributory, is entirely taxable, and is subject to garnishment and attachment. These qualities liken the payments to wages.

*Matter of Harter, supra,* 10 B.R. at 274 (Bkrtcy.N.D.Ind.1981); *Matter of Haynes, supra,* 679 F.2d at 719 (military retirement pay is proceeds for services performed after the filing of the bankruptcy petition, and, thus, it is not property of the estate under § 541(a)(6)).

In *Brown v. Brown (Matter of Brown),* 86 B.R. 944 (N.D.Ind.1988), Chief Judge Sharp found "exciting" the issue raised from a bankruptcy appeal of whether an Indiana Chapter 7 debtor's Arizona lottery annuity payments were properly determined not to be excluded under § 541(c)(2). The debtor received an initial partial distribution after winning the lottery. The balance was made payable to the debtor as the beneficial owner of an annuity. The debtor could not choose to receive his winnings in a full cash payment, and had no right to negotiate the terms of the. annuity contract. Similar to the anti-alienation clause in most ERISA-qualified pension plans and spendthrift trusts we examined *supra,* the annuity purchased by the Arizona Lottery Commission contained a non-alienation notice clause which forbade the debtor from any legal or equitable right to the any of the income or principal of the annuity until such income and principal was actually received by and under the control of the debtor.

The *Brown* Court began its analysis with an examination of the rules governing ERISA-qualified retirement plans (under precedents such as *Cook, Jones, McVade* and *Goff, supra* ), to determine the proper treatment to be afforded anti-alienation clauses:

Eleven USC § 541 is a broadly inclusive statute defining property of a bankruptcy estate.... But for a specific, narrowly construed exception set forth in § 541(c)(2), an interest of a debtor will become property of the bankruptcy estate despite any agreement to the contrary which attempts to restrict the transfer. 11 USC § 541(c)(1)(A).... The law is clear that this provision [11 USC § 541(c)(2) ] was intended by Congress to specifically preserve 'restrictions on transfer of a spendthrift trust.'

As a general rule, a beneficiary's interest in a spendthrift trust is excluded from his bankruptcy estate if state law and the trust so provide.

*Cook, Jones* and *McVade* all involve the issue of whether an ERISA-qualified retirement plan meets the requirements of a spendthrift trust. It is evident from these and other similar cases, that retirement plans will be examined by the

courts on a case by case basis. Some will be seen as spendthrift trusts and others will not, with the key element being that of the beneficiary's access to the funds. A recent amendment to § 30-4-3-2 provides some support for the position that a retirement plan meeting specific requirements might in some limited circumstances qualify as a spendthrift trust. See, Ind. Code 30-4-3-2(c). Again, the key factor appears to be the accessibility of the funds.

In a bankruptcy context, courts have been highly reluctant to find that a plan will shield a fund from the reach of bankruptcy creditors. If the function of the plan diverges in any way from that of a spendthrift trust, despite a superficial fulfillment of requirements, the plan will be viewed as property of the estate. In *Cook* and *McVade*, although the plans contained an anti-alienation clause, and the settlor was not the beneficiary, funds were turned over to the trustee due to a right of withdrawal. In general, the plans were seen to function more like savings plans than spendthrift trusts.

*Brown, supra*, 86 B.R. at 946–47 (citations omitted, brackets supplied).

With the anti-alienation framework in place, the District Court proceeded to distinguish the debtor's lottery annuity contract from the retirement plans discussed above:

The above plans involved at least partial contributions from employee wages. By contrast, the Brown's annuity payments are a windfall....

The debtor's weekly payments are here assured by a contractual agreement....

For purposes of the underlying bankruptcy, as correctly determined by the bankruptcy court, the agreement represents a contractual interest of the debtor, rightfully considered part of the bankruptcy estate....

A spendthrift provision enforceable in bankruptcy court must be contained in a trust. The agreement here is a contract....

It is unthinkable that the Arizona Lottery Commission would have intended, in setting up this method of payment, to aid these Indiana debtors in avoiding creditors' claims in bankruptcy. More likely the plan was seen as having certain tax advantages for all concerned, and as allowing the bulk of the money to remain with the state of Arizona for whatever purposes allowed under Arizona law. As an incidental advantage, the plan does protect these debtors from a short-lived misuse of their windfall.

*Brown, supra*, 86 B.R. at 947–48 (citations omitted).

The IRS View.

■ In any discussion about ERISA, we must look to what the Internal Revenue Service has to say about it. The IRS has expressed their views in *IRS Private Letter Rulings* 89–10035 (March 10, 1989); 88–29009 (April 6, 1988); and, 81–31020 (May 5, 1981). We are mindful, however, that we are not bound by these letter rulings. 26 USC § 6110(j)(3) provides that unless the Secretary otherwise establishes by regulations, a written determination may not be used or cited as precedent. These rulings are important to employers, and because the parties asked that we address them, we do so now.

A threatened disqualification by the IRS of an IRC and ERISA qualified plan will not have an impact on our § 541(c)(2) determination regarding the validity of a spendthrift trust, unless the applicable State case and statutory law so provides. Nor will it alter the conclusion that a non-qualified spendthrift trust plan remains § 541(a) bankruptcy estate property. Furthermore, the outcome of this decision based upon party concessions avoids a potential IRS disqualification of Bethlehem's ERISA-qualified or IRC-qualified plan.

*Private Letter Ruling* No. 89–10035, (March 10, 1989), concerned whether a company should honor a bankruptcy order to distribute benefits from a qualified plan because the distribution would violate 26 USC § 401(a)(13) and cause disqualification of the plan. The plan provided for hardship distribution. The employer had sole discretion to determine whether financial necessity existed and, if so, what portion of

the participant's vested account may be withdrawn. Hardship withdrawals were allowed only to enable a participant to meet circumstances that might severely affect his or her financial affairs or clearly endanger his or her family with present or impending want or deprivation. Employee A, a chapter 7 debtor, with consent of his non-debtor spouse, requested the distribution of his account balance in the plan. The employer approved a hardship distribution to A under the terms of the plan.

The issues addressed by *Private Letter Ruling* No. 89–10035, were as follows:

Based on the above facts, you request a ruling as to whether (1) compliance with the order of the bankruptcy court to pay into the bankruptcy estate of A the value of A's vested benefit under Company M's Plan X will result in disqualification of Plan X under § 401(a)(13) of the Code; and (2) the distribution to A of his vested account balance in accordance with the hardship distribution provisions of Company M's Plan X will not result in disqualification of Plan X under § 401(a)(13) of the Code.

*Id.*

*Private Letter Ruling* No. 89–10035 recited the applicable IRC, Regulations, and legislative history including:

Section 401(a)(13) as added by [ERISA], states that a trust shall not constitute a qualified trust unless the plan of which such trust is a part provides that benefits provided under the plan may not be assigned or alienated. Section 206(d)(1) of ERISA, which is administered by the Department of Labor, provides a similar provision.

Section 1.401.(a)(13) of the Income Tax Regulations provides that, for purposes of section 401(a)(13) of the Code, a trust will not be qualified unless the plan of which the trust is a part provides that benefits provided under the plan may not be anticipated, assigned (either at law or in equity), alienated or subject to attachment, garnishment, levy, execution, or other legal or equitable process.

Section 1.401(a)–13(c)(1)(ii) of the Income Tax Regulations states that the terms 'assignment and alienation' include any direct or indirect arrangement (whether revocable or irrevocable) whereby a party acquires from a participant or beneficiary a right or interest enforceable against the plan in, or to, all or part of a plan benefit payment which is, or may become, payable to the participant or beneficiary.

The legislative history of this statutory provision states that the purpose of the provision is to 'further ensure that the employee's accrued benefits are actually available for retirement purposes …' (H.R. Rep. 93–807, 93rd Cong., 2d Sess. 68 (1974) U.S.Code Cong. & Admin.News 1974, pp. 4639, 4734.)

*Id.*, (brackets supplied). *Private Letter Ruling* No. 89–10035 concluded that these provisions not only regulate tax but also ensure the benefits derived from these plans are not subject to alienation:

The nonalienation provision not only forbids an employee from improvidently bargaining away his or her retirement benefits through voluntary assignment or alienation, but also seeks to protect his or her pension benefits against the claims of general creditors. *See* H.R. Rep. 93–1280 93rd Cong.2d Sess. 280 (1974) U.S.Code Cong. & Admin.News 1974, pp. 5038, 5061.

*Id.*

*Private Letter Ruling* No. 89–10035 applied the following statutory construction to conclude the Bankruptcy Code is not excepted from the IRC or ERISA and declared that funds in a qualified plan are excepted from becoming § 541 property of the bankruptcy estate:

The instant case arises under the [Bankruptcy Code], which was enacted a considerable period of time after ERISA. There is no provision in the Act which would indicate that Congress intended to supersede or modify in any way the provisions of section 401(a)(13) of the Code or section 206(d) of ERISA. Since the enactment of the Bankruptcy Code Congress has amended section 401(a)(13) to provide a narrow exception to the nonalienation rule (See section 401(a)(13)(B) as

amended by section 204(a)(2) of the Retirement Equity Act of 1984. Public Law 98–397). Congress did not add any exception for the bankruptcy of the participant. Moreover, funds in a qualified plan do not become the property of the debtor's estate because of the express exclusion accorded spendthrift trusts under 11 U.S.C. section 541(c)(2). Section 541(c)(2) of the Bankruptcy Code preserves restrictions on the transfer of a beneficial interest of the debtor in a trust which is enforceable under applicable nonbankruptcy law. A restriction on the beneficial interests of the debtor enforceable under nonbankruptcy law remains subject to those restrictions....

*Id.*, (brackets supplied). This *Private Letter Ruling* declares an exception to the just stated position:

However, once any portion of a participant's benefit under a qualified plan is distributed to the participant, either because the terms of the plan permit distribution upon the happening of stated events or because statutory provisions require distribution, then the distributed amounts are no longer subject to the protection of section 401(a)(13) of the Code. The plan engages in no disqualifying activity by complying with the terms of the plan and, in so following, making a direct distribution to the consenting participant. The participant is then free to assign the assets to whomever he chooses.

Section 411(a)(11) of the Code and section 1.411(a)(11)–1 of the Income Tax Regulations restrict distributions from a plan if the present value of any vested accrued benefit exceeds $3,500.00 A plan will meet the requirements of section 411(a)(11) of the Code if the plan provides that such benefits may not be immediately distributed without the consent of the participant. An accrued benefit is immediately distributable if any part of the benefit may be distributed to the participant before the later of normal retirement age or age 62. (*See* section 1.411(a)(11)–1(c)(4) of the Income Tax Regulations).

*Id.*

*Private Letter* No. 89–10035 concluded that the company could not honor the Bankruptcy Court's order to pay into the bankruptcy estate the value of A's vested account balance without resulting in a disqualification of the plan under § 401(a)(13).

*Private Letter Ruling* No. 88–29009 (April 6, 1988), dealt with the same issues as in *Private Letter Ruling* No. 89–10035, *supra*, only this time, the unmarried debtor was in Chapter 11 and was no longer employed as of the date of bankruptcy. The debtor consented to a full distribution. The employer's plan was ERISA and IRC qualified and contained a spendthrift provision and disability, termination, and retirement clauses.

*Private Letter Ruling* No. 88–29009, reciting much the same legal analysis in *Private Letter Ruling* No. 89–10035 *supra*, concluded: "It is our view that section 401(a)(13) is exclusive and definite and preempts the law on alienability of pension benefits in bankruptcy proceedings." *Id.* *Private Letter Ruling* No. 88–29009 added, without any legal support, that even if the Bankruptcy Code was not superseded by ERISA and IRC, the funds in an ERISA and IRC qualified plan were excepted from becoming property of the bankruptcy estate because ERISA and IRC fall within the "applicable nonbankruptcy law" exception under § 541(c)(2).

*Private Letter Ruling* No. 88–29009 concluded that because the participant's employment had ended, the Bankruptcy Court could order a distribution from the plan to the participant but not from the plan directly to the bankruptcy trustee.

*Private Letter Ruling* No. 81–31020 (May 5, 1981), concerned whether a plan administrator should honor a Bankruptcy Court's pension deduction order to fund a debtor's Chapter 13 plan, and whether this would violate the anti-assignment and alienation provisions of § 401(a)(13) and thereby cause the disqualification the ERISA and IRC qualified plan. *Private Letter Ruling* 81–31020 recited the applica-

ble ERISA, IRC, Regulations, and legislative history and concluded:

> The non-alienation provision not only forbids an employee from improvidently bargaining away his retirement benefits through voluntary assignment or alienation, but also seeks to protect his pension benefits from the claims of general creditors. See H.R. Rep. 93–1280, 93rd Cong., 2d. Sess. 280 (1974) U.S.Code Cong. & Admin.News 1974, pp. 5038, 5061 which states:
>
>> ... a plan must provide that benefits under the plan may not be assigned or alienated. However, the plan may provide that after a benefit is in pay status, there may be a voluntary revocable assignment (not to exceed 10 percent of any benefit payment) by an employee which is not for purposes of defraying the administrative costs of the plan. For purposes of this rule, a garnishment or levy is not to be considered a voluntary assignment.

*Id.*, (citation in original). *Private Letter Ruling* 81–31020 went on to distinguish the IRC and Court-made spousal or child support exception [39] to ERISA's anti-alienation requirement from the debtor's bankruptcy plight:

> [W]e do not feel that the policy considerations involved in alimony, support and community property cases apply under the facts ... The use of retirement benefits in pay status to satisfy family support obligations during the plan participant's retirement years is consistent with the legislative intent that such benefits actually be used for retirement purposes. However, the manner in which such benefits would be used in the instant case is not consistent with this legislative intent. Neither the regulations under Code section 401(a)(13), nor the legislative history of this section provide any exception to the anti-alienation requirements for an attachment arising from a bankruptcy proceeding. In this case, the above-described order of the [Bankruptcy Court], if honored, would benefit the general creditors of the plan participant in ques-

tion and thus, would result in a prohibited attachment. Furthermore, even if the attempted alienation by the participant could be considered voluntary, it is not revocable and it exceeds 10 percent of his monthly pension benefit.

*Id.*

Conspicuously absent from the foregoing *Private Letter Rulings* is any analysis as to what law governs the creation and determination of the trust or property interest. The cited IRC, Regulations, and legislative history do not contain such enabling or organic provisions for the creation and determination of such trusts or agreements, but rather, merely require qualified plans contain certain features including an anti-alienation provision to be accorded a certain tax status. The erroneous premise of these *Private Letter Rulings* is that the assets are completely protected by the applicable ERISA and IRC sections. A breach of applicable IRC sections, however, reveals that protection is limited simply to prevention of assessment of certain income and penalty taxes.

The *Private Letter Rulings* are unconvincing in their statutory analysis because an equally valid statutory construction would hold that Congress intended the Bankruptcy Code to take precedent over the prior revenue provisions:

> The systems' refer us to a private letter ruling issued by the Internal Revenue Service, Private Rul. 81–31020 (May 5, 1981) to the effect that a Chapter 13 income deduction order will, if honored, result in disqualification under § 401(a)(13). We sympathize with the systems apparent plight; poised between the Scylla of tax disqualification and the Charybdis of bankruptcy court contempt, they seek only a safe passage through this statutory strait. We believe, however, that to the extent that Congress evidenced clear intent to include pension benefits in the property of a Chapter 13 estate ... it necessarily amended § 401(a)(13) and applicable Treasury regulations accordingly.

---

**39.** 26 USC § 401(a)(13)(B) codifies this Court-made exception.

In so holding we are mindful that the 'strong judicial policy disfavoring the inference that a statute has been repealed *sub silentio* by subsequent legislation' applies with equal force to claims of implied amendment. In this case, of course, § 401 does not necessarily 'irreconcilably conflict' with our interpretation of the Bankruptcy Code. Congress could conceivably have intended that § 401 qualification turn on the happenstance of a pensioner's filing under Chapter 13. But we must presume that Congress was aware of § 401 in formulating Chapter 13, and we cannot believe that it intended to exact § 401 disqualification as the price of exercising Chapter 13 rights. This conclusion is reinforced by 11 U.S.C. § 522(d)(10)(E)(ii), (iii), which limits the applicability of the pension plan exemption available to debtors to those funds qualified under, *inter alia,* § 401. This section makes it clear that Congress did not believe that plans were disqualified under § 401 because their benefits became part of the debtor's estate.

*Regan v. Ross, supra,* 691 F.2d at 87 (2d Cir.1982) (citations omitted).

In *Firestone v. Metropolitan Life Insurance Co. (In re Di Piazza), supra,* 29 B.R. 916, 10 B.C.D. 618 (Bkrtcy.N.D.Ill.1983), (followed by *Berndt, supra* ), the *Di Piazza* Court rejected the argument that if the Chapter 7 bankruptcy trustee was allowed to reach the debtor's interest in the profit-sharing and pension plans, both plans would be disqualified under § 401(a)(13) and would harm thousands of employees. The *Di Piazza* Court followed the reasoning of the *Ross* Court to reject the position taken by *Private Letter Ruling* No. 81–31020:

> Addressing this argument, this court notes that ERISA Section 1144(d) provides in relevant part that 'Nothing in this subchapter shall be construed to alter, amend, modify, invalidate, impair or supersede any law of the United States....' 29 USC § 1144(d) (1979). Since this court has ruled that the ERISA plans in question do not fall under the exceptions permitted by Section

541(c)(2), the normal anti-alienation requirements of ERISA conflict with Section 541(c)(1)(A) of the Bankruptcy Code.... Consequently, this court holds that to the extent that the provisions of the Bankruptcy Code and ERISA conflict, Section 541(c)(1)(A) implicitly amends the normal anti-alienation provisions of ERISA.... Consequently, this court holds that an order by a bankruptcy court directing a pension plan to pay a Chapter 7 trustee does not disqualify a plan from receiving favorable tax treatment pursuant to Internal Revenue Code Section 401(a)(13).

*Di Piazza, supra,* 29 B.R. at 922–23 (citations omitted). *Accord, White v. Babo (In re Babo),* 81 B.R. 389 (Bkrtcy.W.D.Pa. 1988), *reconsideration denied, White v. Babo (In re Babo),* 97 B.R. 827, 830 (Bkrtcy.W.D.Pa.1989); *Gray v. Ingles Markets, Inc. Employees' Stock Bonus Plan and Trust (In re Deweese),* 47 B.R. 251, 256 (Bkrtcy.W.D.N.C.1985).

■ In the instant proceeding, we may resolve the potential preemption conflict and conflicts between the Federal schemes, *i.e.,* Bankruptcy Code, IRC, ERISA, and Indiana State law, by accepting Bethlehem's prayer and the Trustee's modified position that any order concerning the ESOP shall direct Bethlehem and the ESOP's trustee to make the pre-bankruptcy allocated payments directly to the Debtor, who, in turn, will turn over the proceeds to the Trustee. Furthermore, even if Bethlehem and the Trustee were not so accommodating to each other, a distribution from the ESOP would not disqualify the plan. We believe that Congress intended to include pension benefits as property of the estate. We don't believe, however, Congress intended that the happenstance of bankruptcy to a minority of plan participants would disqualify those plans. Our conclusion attunes the maxim that we should give effect to a stature whenever possible.

■ A question arises whether the conclusions reached by the Circuit Courts we reviewed, *supra,* remain viable after

the preemption holding taken by the Supreme Court in *Mackey* and *Pilot Life. Mackey v. Lanier Collection Agency & Services, Inc.*, 486 U.S. 825, 108 S.Ct. 2182, 100 L.Ed.2d 836 (1988); *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987).

The answer lies in 29 USC § 1144[40] and the Bankruptcy Code's adaptation of State spendthrift law as "applicable nonbankruptcy law" under § 541(c)(2) for a bankruptcy determination of a Federal exception to § 541 property of the estate. Thus, our problem does not present an otherwise fatal preemption conflict between an ERISA and state exemption scheme.[41] Rather, the potential conflict is between two Federal schemes—the Bankruptcy Code and ERISA. Ultimately, we not only determine ERISA expressly yields to the Bankruptcy Code, but that it must. Thus, we conclude the Bankruptcy Code's adaptation of applicable State spendthrift law renders ERISA restrictions on alienation and assignment ineffective in bankruptcy unless applicable State statutory and case law direct otherwise. Under applicable Indiana statutory and case law on spendthrift trusts and given the Debtor's right of access under the terms of the ESOP, we hold that the portion of the ESOP funds allocable pre-bankruptcy is not excepted under § 541(c)(2).

In *Mackey v. Lanier Collections Agency & Service, Inc.*, 486 U.S. 825, 108 S.Ct. 2182, 100 L.Ed.2d 836 (1988), the Supreme Court affirmed a Georgia Supreme Court's ruling that a statute exempting longshoreman's vacation and holiday benefit funds from garnishment was preempted by ERISA when the benefits qualified under ERISA as an "employee welfare benefit plan,"[42] and were not so protected from garnishment under ERISA. To reach this conclusion, the Supreme Court relied on the preemption provision expressed in ERISA's § 514(a) "any and all State laws insofar as they may now or hereafter relate to any

---

**40.** 29 USC § 1144, **Other Laws,** provides in pertinent parts for the supersedure of State law and non-supersedure of certain Federal laws:

(a) **Supersedure; effective date.** Except as provided in subsection (b) of this section, the provisions of this title and title IV shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 4(a) [29 USC § 1003(a)] and not exempt under section 4(b) [29 USC § 1003(b)]. This section shall take effect on January 1, 1975 ...

(c) **Definitions.** For purposes of this section:

(1) The term 'State law' includes all laws, decisions, rules, regulations, or other State action having the effect of law, of any State. A law of the United States applicable only to the District of Columbia shall be treated as a State law rather than a law of the United States.

(2) The term 'State' includes a State, any political subdivisions thereof, or any agency or instrumentality of either, which purports to regulate, directly or indirectly, the terms and conditions of employee benefit plans covered by this title.

(d) **Alteration, amendment, modification, invalidation, impairment, or supersedure of any law of the United States prohibited.** Nothing in this title shall be construed to alter, amend, modify, invalidate, impair, or supersede any law of the United States (except as provided in sections 111 [29 USC § 1031] and 507(b) [29 USC § 1137(b)]) or any rule or regulation issued under any such law.

**41.** In the context of Indiana's recent amendment adding subsection (c) to I.C. 30–4–3–2, to incorporate the IRC and ERISA provisions in spendthrift trust as an exception to the rule against self-settled trusts, the Court in *Matter of Gifford, supra,* 93 B.R. at 639 n. 2 (Bkrtcy.N.D. Ind.1988), avoided addressing the potential tension between a State exemption law and ERISA:

This court has concerns about the validity of Indiana's amendment to its trust code. The State's ability to enact legislation in this area may have been preempted. 29 U.S.C. § 1144(a). *See also Mackey v. Lanier Collections Agency & Service, Inc.,* 486 U.S. 825, 108 S.Ct. 2182, 100 L.Ed.2d 836 (1988); *Metropolitan Life Insurance Company v. Massachusetts,* 471 U.S. 724, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985); *Shaw v. Delta Airlines Inc.,* 463 U.S. 85, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983). Further, to the extent the statute may construed as an attempt to obstruct the equitable distribution of assets, by preventing property from becoming part of a bankruptcy estate, it may vulnerable under the Supremacy Clause. See *Elliott v. Bumb,* 356 F.2d 749 (9th Cir. 1966); *In re Smith–Douglass, Inc.,* 856 F.2d 12 (4th Cir.1988). We need not, however, address these concerns at the present time.

**42.** As defined in 29 USC § 1002(3), employee plans are of two types: "employee welfare benefit plan" which provide health, legal, vacation, or training benefits, § 1002(1); and, "employee pension benefit plan" which provides for retirement income, § 1002(2).

employee benefit plan" covered by the statute. 29 USC § 1144(a).

The Georgia statute at issue here expressly refers to—indeed, solely applies to—ERISA employee benefit plans. 'A law "relates to" an employee benefit plan, in the normal sense of the phrase, if it has a connection with *or reference* to such a plan.' *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96–97, 103 S.Ct. 2890, 2899–900, 77 L.Ed.2d 490 (1983) (emphasis added). On several occasions since our decision in *Shaw*, we have reaffirmed this rule, concluding that state laws which make 'reference to' ERISA plans are laws that 'relate to' those plans within the meaning of § 541(a). See, *e.g.*, *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, —— [41, 107 S.Ct. 1549, 95 L.Ed.2d 39] (1987); *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 739, 105 S.Ct. 2380, 2388–89, 85 L.Ed.2d 728 (1985). In fact, we have virtually taken it for granted that state laws which are 'specifically designed to affect employee benefit plans' are pre-empted under § 541(a). Cf. *Pilot Life Ins. Co. v. Dedeaux, supra*, at ——; *Shaw v. Delta Air Lines, Inc., supra*, at 98, 103 S.Ct. at 2900.

The possibility that … [Georgia statute] was enacted by the Georgia legislature to help effectuate ERISA's underlying purposes … is not enough to save the state law from pre-emption. 'The pre-emption provision [of 514(a)] … displace[s] all state laws that fall within its sphere, even including state laws that are consistent with ERISA's substantive requirements.' *Metropolitan Life Ins. Co. v. Massachusetts, supra*, at 739, 105 S.Ct. at 2388–89. Legislative 'good intentions' do not save a state law within the broad pre-emptive scope of § 514(a).

*Mackey v. Lanier Collections Agency & Service, Inc., supra*, 486 U.S. at ——, 108 S.Ct. at 2185, 100 L.Ed.2d at 843–44 (1988) (emphasis in original, brackets supplied).[43] The *Mackey* Court held that although the State statute's express reference to ERISA

plans was sufficient to bring it within the ERISA's Federal law preemptive reach, ERISA did not expressly forbid garnishment of an ERISA "welfare benefit plan" (unlike the anti-alienation provisions expressed in § 1056 for an ERISA's "pension benefit plan"). Thus, there was no actual prohibition by ERISA against a State's garnishment proceeding against an employee's welfare benefit plan. Since the Georgia anti-garnishment statute prohibits that which the Federal statute permits, the State's anti-garnishment statute was preempted by ERISA.

In *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987), an employee brought a diversity action against the insurance company on common-law tortious breach of contract and bad faith causes of action. The employee alleged improper processing of a claim for benefits under an insured employee benefit plan. After reciting ERISA's legislative history, the Supreme Court reaffirmed its earlier position that Congress intended to establish pension plan regulation as an exclusive Federal concern and that Courts should broadly construe § 1144(a)'s "any and all state laws insofar as they may now or hereafter relate to any employee benefit plan." *Id.*, 481 U.S. at 47, 107 S.Ct. at 1553.

In ERISA, Congress set out to

'protect … participants in employee benefit plans and their beneficiaries, by requiring the disclosure and reporting to participants and beneficiaries of financial and other information with respect thereto, by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions, and ready access to the Federal courts.' § 2, as set forth in 29 USC § 1001(b). Congress capped off the massive undertaking of ERISA with three provisions relating to the pre-emptive effect of the federal legislation. . . .

---

**43.** For an excellent analysis of the *Mackey* opinion, *see, In re Volpe*, 100 B.R. 840 (Bkrtcy.W.D. Tex.1989).

To summarize the pure mechanics of the provisions [29 USC § 1144] quoted above: If a state law 'relate[s] to ... employee benefit plan[s],' it is pre-empted. § 514(a) [29 USC § 1144]. The saving clause excepts from the pre-emption clause laws that 'regulat[e] insurance.' § 514(b)(2)(A) [29 USC § 1144(b)(2)(A)]....

'[T]he question whether a certain state action is preempted by a federal law is one of congressional intent ... We have observed in the past that the express pre-emption provisions of ERISA are deliberately expansive, and designed to "establish pension plan regulation as exclusively a federal concern." '

As we explained in *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 98, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983):

'The bill that became ERISA originally contained a limited pre-emption clause, applicable only to state laws relating to the specific subjects covered by ERISA. The Conference Committee rejected those provisions in favor of the present language, and indicated that section's pre-emptive scope was as broad as its language. *See* HR Conf.Rep. No. 93–1280, p 383 (1974); S Conf. Rep No. 93–1090, p. 383 (1974) U.S.Code Cong. & Admin.News 1974 pp. 5038, 5162.'

The House and Senate sponsors emphasized both the breath and importance of the preemption provisions. Representative Dent described the 'reservation to Federal authority the sole power to regulate the field of employee benefit plans' as ERISA's 'crowning achievement.' 120 Cong.Rec. 29197 (1974). Senator Williams said:

'It should be stressed that with the narrow exceptions specified in the bill, the substantive and enforcement provisions of the conference substitute are intended to preempt the field for Federal regulations, thus eliminating the threat of conflicting or inconsistent State and local regulation of employee benefit plans. This principle is intended to apply in its broadest sense to all actions of State or local governments, or any instrumentality thereof, which have the force or effect of law.' *Id.*, at 29933.

*Pilot Life Ins. Co., supra,* 481 U.S. at 44–46, 107 S.Ct. at 1551–52, 95 L.Ed.2d at 45–47 (citations omitted, brackets added). *See, Secretary of Labor v. Fitzsimmons,* 805 F.2d 682, 689–90 (7th Cir.1986). *Fitzsimmons* examined pre-ERISA history and legislative history. The *Fitzsimmons* Court held Congress intended to promote uniformity in furtherance of ERISA's remedial and protective purposes.

The *Pilot* Court held there was no doubt that the common law causes of actions "related to" an employee benefit plan and therefore fell under ERISA's expressed preemption clause. 29 USC § 1144(a). The only question was whether the employee's causes of action fell within the ERISA's exemption or savings clause of "regulate[ing] insurance," under 29 USC § 1144(b)(2)(A). *Pilot* rejected Mississippi Supreme Court precedent that identified its law of bad faith with the insurance industry. *Pilot* held that such action was not saved from ERISA's preemption because the "roots of this law are firmly planted in the general principles of Mississippi tort and contract law."

Several Courts have bypassed the preemptive reach of ERISA and retained the vitality of their earlier respective Circuit Court rulings despite the Supreme Court rulings announced in *Mackey* or *Pilot.* In *Kaplan v. Primerit Bank (In re Kaplan),* 97 B.R. 572 (9th Cir.BAP 1989), the Court held a converted Chapter 7 debtor's interest in an employer-funded pension plan was not exempt and was property of the estate under the authority of the Ninth Circuit case of *Daniel, supra.* In response to a *Mackey* assault on *Daniel,* the BAP Court stated:

The debtor argues that the recent Supreme Court decision [*Mackey*] undercuts the rationale of *Daniel.* We disagree. *Mackey* held, *inter alia,* that a Georgia statute that singled out ERISA welfare plan benefits for protective treatment under Georgia garnishment procedures was preempted by ERISA. Since

*Daniel* held that section 541(c)(2) applies only to traditional spendthrift trusts as defined by state law, *Mackey* has no relevance to the issues before this Panel. *Mackey* did not redefine traditional spendthrift trusts.

*Kaplan v. Primerit Bank (In re Kaplan), supra,* 97 B.R. at 576 (citations omitted, brackets added).

In *Heitkamp v. Dyke (In re Dyke),* 99 B.R. 343 (Bkrtcy.S.D.Tex.1989), the Chapter 7 trustee objected to Dr. Dyke's claim of exemption of the self-settled pension plan created by his professional association. Dr. Dyke was its sole trustee, director, and shareholder. The Court in *Dyke* rejected the debtor's *Mackey* assault on *Goff, supra.*

Debtor argues that *Mackey* impliedly overrules *Goff,* which held that ERISA restrictions are ineffective in bankruptcy, and a pension plan must further qualify as a spendthrift trust under state law to be excluded from the estate. He asserts that *Mackey* confirms that pension plans which contain the transfer restrictions set forth in 29 U.S.C. § 1056(d)(1) are exempt from the reach of creditors. Given that creditors cannot reach the beneficial interest in an ERISA qualified pension plan, debtor maintains 'there is no difference between the trust created by such a plan and a valid spendthrift trust since the only distinguishing aspect of a valid spendthrift trust is that it protects the beneficiary's interest from claims of the beneficiary's creditors.' Debtor further argues that to the extent that state spendthrift law relied upon by the court in *Goff* imposes the requirement that a trust not be self-settled to be a valid spendthrift trust, ERISA preempts such law to allow it. The debtor concludes that to the extent that *Goff* applied state spendthrift trust law to negate the effect of ERISA restrictions on transfer in bankruptcy, it must be reexamined. If preempted by ERISA, then ERISA restrictions on transfer remain effective in bankruptcy, and 'ERISA is left as the only possible "applicable nonbankruptcy law" under § 541(c)(2).'

Debtor argument fails in two important respects. First, the Fifth Circuit in *Goff* did not resort to state spendthrift trust law to negate in bankruptcy the effect of ERISA's anti-alienation and assignment provisions. Instead, the court applied federal bankruptcy law.... Consequently, the court was able to safely conclude that since federal law and federal policies operated to negate ERISA's anti-alienation and assignment provisions, no preemption issue was presented by virtue of ERISA's non-displacement of federal law....

*Goff,* on the other hand, holds that *as a matter of federal bankruptcy law,* ERISA's restrictions on alienation must succumb to Congressional intent to include within the estate 'all legal or equitable interests of the debtor in property as of the commencement of the case.' See 11 U.S.C. § 541(a)(1). In no manner, does the Supreme Court's decision in *Mackey* overrule the central holding of *Goff* that ERISA's restraints on alienation are insufficient as a matter of bankruptcy law to avoid inclusion of a pension plan within the debtor's estate. Second, even if ERISA preempts state spendthrift trust law, the conclusion debtor draws from this supposition simply doesn't follow. As previously noted, bankruptcy law *not* state spendthrift trust law operates to render ineffective in bankruptcy ERISA restrictions on alienation and assignment.... Pre-emption, however, would not elevate ERISA to the status of 'applicable nonbankruptcy law.'

Finally, the strongest argument against debtor's interpretation of Section 541(c)(2) is the fact that Congress considered ERISA pension plans in Bankruptcy Codes's exemption section. *See* 11 U.S.C. § 522(b)(2)(A). Such consideration would be entirely unnecessary if Congress intended ERISA qualified plans to be excluded from the estate under Section 541.

*Dyke, supra,* 99 B.R. at 345–46 (emphasis in original, citations omitted).

In *Watson v. Kincaid (In re Kincaid),* 96 B.R. 1014 (9th Cir. BAP 1989), the Bank-

ruptcy Court held a debtor-employee's voluntary salary deferral and supplemental contributions were property of the estate. The BAP Court affirmed despite the objection interposed by the plan's administrator that ERISA was within § 541(c)(2)'s "applicable nonbankruptcy law." The BAP Court found under the authority of *Daniel, Goff, Lichstrahl,* and *Graham, supra,* "[t]he reference to 'applicable nonbankruptcy law' in subsection (c)(2) [§ 541(c)(2) ] has been interpreted as applying *only* to state spendthrift trust law.... Accordingly, ERISA-qualified pension plans ... are excluded pursuant to § 541(c)(2) only if they are enforceable under state law as spendthrift trusts." *Kincaid, supra,* 96 B.R. at 1017 (emphasis in original, citations omitted). In response to an attack on *Daniel* by *Pilot,* the BAP Court pointed out the limitation Congress placed within ERISA when it conflicts with other Federal law; namely, 29 USC § 1144(d).

> While it is true that 29 U.S.C. § 1144(a) provides that ERISA overrides state law, [appellant] fails to note that pursuant to 29 U.S.C. § 1144(d) Congress also provided that ERISA does not 'alter, amend, modify, invalidate, impair, or supersede any law of the United States ...' In our view, examination of an ERISA plan under state spendthrift trust law as mandated by 11 U.S.C. § 541(c)(2) is not an application of state law to an ERISA plan, but rather the application of federal bankruptcy law to an ERISA plan.... Section 541(c)'s mandated examination of an ERISA plan under state spendthrift trust law involves the application of bankruptcy law to an ERISA plan and, thus, is not prohibited by 29 U.S.C. § 1144(a). Accordingly, it is not relevant to our inquiry that *Pilot Life* advocates a broad reading of § 1144(a).

*Kincaid, supra,* 96 B.R. at 1018 (citations omitted, brackets added). *See, In re Hysick,* 90 B.R. 770, 774 (Bkrtcy.E.D.Pa.1988); *In re Pettit,* 61 B.R. 341, 345 (Bkrtcy.W.D. Wash.1986); *In re Di Piazza, supra,* 29 B.R. at 922–23.

In *Fox Valley & Vicinity Construction Workers Pension Fund v. Brown,* 879 F.2d 249 (7th Cir.1989), the Fund brought an interpleader action against a fund participant's ex-spouse and mother to determine who is the proper recipient of a death benefit. The ex-spouse appeared to have waived any right to fund benefits as the result of the divorce property settlement agreement. The plan participant, however, made no effort to remove the ex-spouse as the plan's designated beneficiary, and continued to live with the ex-spouse until his death. The District Court denied the ex-spouse's motion for summary judgment and entered summary judgment in favor of the mother. The *Fox Valley* Court affirmed.

> We must determine whether a divorced spouse who was designated as a beneficiary prior to the divorce will still receive the Death Benefit despite a provision in the divorce settlement waiving any rights to the benefit. Because ERISA preempts state pension benefit laws, 29 U.S.C. § 1144(a), we must find the answer to this issue within ERISA itself or in the federal common law interpreting ERISA....

> Laurine argues that since the settlement is not a QDRO [qualified domestic relations order], the anti-alienation provisions nullify the property settlement....

> In arguing that her waiver is preempted by ERISA, Laurine misinterprets the purpose behind the spendthrift provisions and the intended effect of a QDRO. The spendthrift provisions of ERISA are designed to 'ensure that the employee's accrued benefits are actually available for retirement purposes,' by preventing unwise assignment or alienation. H.R. Rep. No. 807, 93d Cong., 2d Sess. 1974, *reprinted in* 1974 U.S.Code Cong. & Admin.News 4670, 4734. These provisions focus on the assignment or alienation of benefits by a participant, not the waiver of a right to payment of benefits made by a designated beneficiary....

> When ERISA is silent on an issue [what constitutes a valid waiver], a federal court must fashion federal common law rules to govern ERISA suits. In making such rules, we must of course look to the statute itself for guidance ... and it is

also proper to turn to state law when creating such rules ... as long as such state law is consistent with the policies underlying the federal statute at issue. *Id.,* 879 F.2d at 252–53 (citations omitted, brackets supplied) (held a nonparticipant in a plan could waive rights to pension benefits by a specific provision in a divorce settlement agreement under the forum State despite the failure of the plan participant to follow the method of changing beneficiaries under the express terms of the plan) (Ripple, J., dissenting, departs from the majorities' methodology of filling Federal statutory and common law gaps with analogous principles of State law, and would reverse the District Court because, *inter alia,* the plan participant did not change the ex-spouse as the designated beneficiary under the express terms of the plan documents).

In a nonbankruptcy context and in *dicta,* the Seventh Circuit remarked on ERISA's preemptive reach:

> Was the district judge also acting reasonably when he dismissed the pendant state-law counts? ERISA contains both an emphatic preemption provision, 29 U.S.C. § 1144(a); see, e.g., *Mackey v. Lanier Collections Agency & Services, Inc.,* 486 U.S. 825, 108 S.Ct. 2182, 2185, 100 L.Ed.2d 836 (1988); *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 107 S.Ct. 1549, 1553, 95 L.Ed.2d 39 (1987), and an implied prohibition of oral modifications of pension plans, see 29 U.S.C. § 1103(a)(1), (b)(3); *Nachwalter v. Christie,* 805 F.2d 956, 960 (11th Cir. 1986). The combined effect may well be to preclude any claim of promissory estoppel arising from the administration of a pension plan covered by ERISA.... But this we need not decide....

*Bash v. Firstmark Standard Life Ins. Co.,* 861 F.2d 159, 163–64 (7th Cir.1988).

## CONCLUSION

We conclude from the foregoing that 29 USC § 1144(d) requires ERISA-qualified plan's anti-alienation provision to yield to the Bankruptcy Code in the event of a conflict between the two Federal schemes.

Accordingly, the entire Employee Investment Program funds earned or accrued pre-bankruptcy are property of the estate, § 541(a), because the Bankruptcy Code prevails over ERISA, and because Debtor's right of access departs from the traditional State spendthrift exception. We will permit Debtor to exempt his $100.00 exemption from the proceeds delivered to the Trustee. The Trustee and Bethlehem will be directed to consult with each other and the custodian to arrive at a calculation of Debtor's interest. In the event an agreement cannot be reached, the Trustee may arrange for a hearing to determine the appropriate allocation between pre-and post-bankruptcy earnings.

The Trustee is hereby directed to prepare an Order, on notice to Bethlehem and Debtor, in accordance with this Memorandum of Decision.